**Larry Junior WARD, Appellant,**

v.

**Gene M. JOHNSON, Warden, Sgt. Gardner, Chairman of Adjustment Committee, Appellees.**

No. 79–6304.

United States Court of Appeals, Fourth Circuit.

Heard *En Banc* March 29, 1982.

Decided Oct. 7, 1982.

Carter Glass, IV, Richmond, Va. (Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellant.

Richard F. Gorman, III, Asst. Atty. Gen., Richmond, Va. (Gerald L. Baliles, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees.

Before WINTER, Chief Judge, and BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges, sitting en banc.

DONALD RUSSELL, Circuit Judge:

This is an action by an inmate (Ward) of the Virginia prison system seeking damages under 42 U.S.C. § 1983 for an alleged violation of his federal constitutional right by state prison officers in the course of a disciplinary hearing on a charge of prison misconduct by the inmate. The original defendants were the warden of the prison where the inmate was assigned, the defendant Gene M. Johnson, and the Chairman of the Adjustment Committee presiding at the plaintiff's disciplinary hearing, the defendant H. T. Gardner. The defendant Johnson was dismissed as a defendant at the conclusion of the testimony by the district judge and that dismissal is not contested on appeal. The inmate-plaintiff, however, has appealed the dismissal by the district court of his action against the defendant Gardner. A panel of this Court, after initial oral argument of the appeal, ruled that the plaintiff's procedural due process rights had been violated by an evidentiary ruling made by the Chairman at the disciplinary hearing and that he was entitled to recover at least minimal damages on account of such constitutional violation. After that decision was filed, a majority of this Court voted in favor of *en banc* rehearing of the appeal, with consideration directed particularly to the question whether the defendant Gardner was entitled to immunity, absolute or qualified. Reargument was had and, after due consideration, a majority of the *en banc* court voted to affirm the dismissal of the action against the defendant Gardner on the ground that he enjoyed absolute immunity in connection with the action charged as a constitutional violation.

The disciplinary proceeding, which provided the subject matter of this action, arose out of a disturbance among the prison inmates in the recreational area of the

Mecklenburg Correctional Center where the plaintiff was confined. An inmate, Graham, had fashioned a crude knife-like instrument out of a radio antenna. With this instrument he attacked another inmate and precipitated a general prison commotion in the recreational area. The prison officers intervened to terminate the disturbance by taking control of the principal instigator of the confusion, Graham. While they were so engaged, the plaintiff became involved. Corporal Goode, who observed the plaintiff's action, filed a charge against the plaintiff under the "Code of Inmate Offenses" set forth in the Guidelines issued by the Virginia Department of Corrections and made available to all inmates [1] in an official Handbook. The offense charged was "Delaying, hindering or interfering with an employee in the performance of his/her duties." [2] As filed the charge included as required a statement of the reporting officer, Corporal Goode, that "[o]n the above date and time (December 15, 1977, at 11:30 A.M.) I observed inmate L. Ward 104669 (the plaintiff) resisting and wrestling with Officer Hawkins and Mr. Finkbeiner as they were attempting to break up a fight between R. Graham 967461 and B. Arnold 103942 on the recreational yard." [3]

The procedure for processing a report such as that filed by Corporal Goode against the plaintiff is carefully prescribed by Guideline No. 861 of the Virginia Department of Corrections. Under this Guideline, a reporting officer, after submitting his report, is enjoined from any further involvement with the proceeding, "with any witnesses the accused inmate may request, with other witnesses, with members of the Adjustment Committee, or anyone else involved with the adjudicatory process before judgment is made on the charge." [4] The report itself is initially reviewed by the reporting officer's superior,[5] and after such review, if found "in good order", the charge is referred to the Adjustment Committee, which consists of a Chairman and two assigned officers, for trial and disposition.[6]

The Guideline provides that when a charge is referred to the Adjustment Committee, "the accused inmate must be advised of his/her rights in connection with the disciplinary process." Where an inmate is charged as here with a "Major Violation", such rights include (a) the right at his option either to employ a private attorney or to utilize the services of an inmate or staff adviser "to assist in the presentation of a defense," (b) "to present the voluntary testimony of witnesses, either inmates, correctional personnel or others, in his/her own behalf," (underscoring in text) and (c) to "cross-examine for relevant purposes, the

---

1. The authority to promulgate regulations and guidelines is granted the Department of Corrections by § 53-19.34, Virginia Code (1978 Replacement Volume).

2. This offense is defined as a "Category B: Major Violation" under the heading, "Code of Inmate Offenses" in Division Guideline No. 861, Section III, Category B, subsection 5.

3. *See* Section VI, subsection A(1) and (2), Division Guideline, Department of Corrections, No. 861.

4. *Ibid.,* Section VI, subsection A(4).

5. The purpose of such review, as set forth in the regulations, was "to determine whether the report is in good order, contains all relevant information and is sufficient to put the accused inmate on notice of the charge being brought against him/her." *Ibid.,* Section VI, subsection B(1).

6. The Adjustment Committee's composition is provided in Section H of the Guideline. The Committee, as we indicate later, "is not left at large with unlimited discretion" but its members are subject to "controlling regulations" considerably stricter than those required in *Wolff* (*Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974)).

The propriety of using prison personnel as the members of the Adjustment Committee was considered and found not invalid in *Wolff.* In that case, the Supreme Court "decline[d] to rule that the Adjustment Committee which conducts the required hearings at the Nebraska Prison Complex and determines whether to revoke good time is not sufficiently impartial to satisfy the Due Process Clause.... We find no warrant in the record presented here for concluding that the Adjustment Committee presents such a hazard of arbitrary decision-making that it should be held violative of due process of law." 418 U.S. at 570–71, 94 S.Ct. at 2981.

reporting officer who shall be present at the Adjustment Committee hearing." The accused inmate, however, is to be advised "that witnesses may be excluded if their testimony is merely cumulative or repetitive," and that the reporting officer would be present at the hearing for cross-examination.[7] The inmate is further given the right to list any witnesses he wishes to appear.

While the Guideline provides that any witness requested to appear by the accused inmate has "the option to appear or not," it mandates that prison officials shall endeavor to persuade the requested witnesses to give a statement of their knowledge of relevant facts and, if they decline, such requested witnesses, "be they inmates or employees," must "state in writing the reasons they refuse to appear." The Guideline warns that if it later appears that "pertinent employee testimony was not given when requested, a reversal may be ordered."[8]

The plaintiff in this case waived the right to an attorney given him under the Guideline but did elect to be assisted at the hearing by an inmate adviser of his selection, one Patterson, who was assigned to assist him. As required, the plaintiff listed three witnesses, all fellow inmates, whose testimony or statements he wished to use at the hearing.

Statements of their knowledge of the incident in the charge were procured from all witnesses requested by the plaintiff to appear at the disciplinary hearing, and these statements were furnished the plaintiff before the hearing began.[9] At the hearing the Chairman, the defendant Gardner, presided. Under the prison Guideline he was to rule on all evidentiary questions.[10] In connection with this responsibility, the Guideline imposes on the "Chairman [the duty to] examine each witness' statement for relevance to the charge and for repetitiousness" and if he finds the statement to be irrelevant or repetitious, he may "exclude such witness from the hearing, although [in that event] the Chairman shall enter the witness' statement into the record of the Adjustment Committee for consideration by the other members of the Committee."[11]

At the hearing before the Adjustment Committee chaired by the defendant Gardner, on the charge filed against the plaintiff, Corporal Goode was called as a witness, testified and was cross-examined by the plaintiff. In his testimony he said that, after the officers had subdued Graham and had him under control, the plaintiff intervened and kicked Graham "in the ass." On cross-examination he was asked what he meant by asserting in his report that the plaintiff "was resisting—wrestling." Goode responded that "in my point of view it looked like you (referring to the plaintiff) were wrestling with the officer. And after you had kicked Graham in the ass I had no other alternative but to figure that out in my mind." Later, the plaintiff, testifying in his defense, was asked directly by a member of the Committee:

> "From what I understand when Mr. Finkbiner and officer Hawkins, Corporal Goode had the inmate that was trying to stab everybody down on the ground. And you went up and kicked him in the ass?"

He answered this direct question,

> "Yeah."[12]

---

**7.** *Ibid.,* Section VI, D, 1, 2, 3a, b, c, d, 4 a i, b, 5 a i, ii, b and c.

**8.** *Ibid.,* Amendment, Sections 3, 4 and 5.

**9.** This procedure is mandated under the Guideline, Section H, subsection 2 b i, ii, iii, iv.

**10.** *Ibid.,* Section H, subsection 2 c.

**11.** *Ibid.,* Section H, subsection 2 b, ii.

**12.** While admitting the truth of this statement, the plaintiff argued that he was "not charged with that," referring to his action in kicking Graham while the latter was on the ground under the control of the two officers. At an earlier point in the hearing, the plaintiff had explained his reason for failing to have admitted his guilt of a charge of interfering by kicking Graham under the circumstances. He said:
"I was charged with delaying, hindering, or interfering with an employee in the performance of his duty. The charge read that on

This frank admission of his conduct by the plaintiff was accepted by the Chairman as well as by the other members of the Committee as the dispositive fact on the issue of the plaintiff's guilt or innocence of the charge of "[d]elaying, hindering or interfering with a [prison] employee in the performance of his/her duties [during a prison commotion]." After the plaintiff had made this admission, the Chairman inquired of him, "do you have anything you want to say about these witness statements?" The plaintiff replied, "No, I don't have nothing." The Chairman then addressed the inmate's adviser, inviting any response he might like to make. The adviser expressed a desire to make a motion. The motion is not in the record but as the grounds of appeal, later filed by the plaintiff and his adviser, demonstrate, they restated his claim of variance between charge and proof and his assertion of an absolute right to call the witnesses and to cross-examine them.

After reviewing the witnesses' statements, no one of which contradicted the plaintiff's own admission of kicking Graham after the latter had been thrown to the ground and subdued by the officers, the Chairman "exclude[d]" such witnesses on the grounds that their testimony would be repetitive or "accumulative," as he put it, and irrelevant as presenting nothing "that would make any difference whatsoever on the point in question." [13] The Chairman, however, read the statements into the record for such consideration as the other members of the Committee might wish to give such statements.

After consideration of the record, which was tape-recorded as required under the prison Guideline,[14] the Committee found the plaintiff guilty of the offense charged and imposed as a penalty "10 days loss of recreation time" coupled with a recommendation of an "I.C.C. review." [15] From this deter-

---

the above date and time I was resisting and wrestling with Officer Hawkins and Officer Finkbiner. When attempting to break up a fight between R. Graham and Deono. That's what the charge read. The charge don't read nothing about me fighting or nothing like that. *See what I am saying now. You understand. Therefore that was the only reason I couldn't admit no guilt there. Understand."* (Italics added)

13. One of the witnesses' statements said simply that the plaintiff was "looking after his own self and safe being" while "Ronald [Graham] was striking at numerous inmates on the recreation yard." (Witness Orpiano) A second stated that the plaintiff "was trying to prevent Inmate R. Graham from *stabbing me."* (Witness Moore) Finally, the third referred to the officers "yelling for him (the plaintiff) to stop fighting" but added that the officers "jumped on the wrong person because R. Graham was the person that was attacking people on the recreation yard." (Witness Arnold)

It was the Chairman's view that what the witnesses had to say did not contradict the plaintiff's own candid admission that he had intervened while the officers were subduing Graham and after they had thrown him to the ground.

14. The regulation or "Division Guideline," as it is designated in the Department of Corrections Manual, provides:

"The Chairman shall insure that the entire Adjustment Committee hearing is tape-re-

corded, excluding only that portion of the hearing in which the Committee deliberates on guilt or innocence and penalty."

*Ibid.,* Section H, subsection f, i.

This provision in the Guideline has been amended as of July 12, 1978, to provide that:

"*To assure that the tape-recorder is operating properly, a test should be conducted prior to the hearing and played back by the operator. At the end of the hearing another test should be conducted. In the event the tape is inaudible a re-hearing should be conducted."*

The same amendment provides for the retention of all tapes "for two years."

15. The Adjustment Committee follows a "two-stage" procedure in disposing of a major violation. In the first stage, the Committee confines itself to the determination of guilt or innocence and in this phase of the proceedings, the accused inmate's prison record may neither be introduced nor considered. If the Committee finds the inmate guilty, the second stage of the proceedings relates to the penalty to be imposed. The procedure at this second stage, as stated in the Guideline, is as follows:

"Prior to the designation of a penalty, the accused inmate is to be informed of the Committee's findings and given an opportunity to present evidence regarding an appropriate penalty .... the Chairman shall cause the inmate's institutional record to be physically present for consideration by each committee *member so that such may be used in determining the nature of any penalty to be assessed."*

mination, the plaintiff appealed to the Superintendent of the institution on three grounds, only two of which are relevant in this proceeding.[16] He contended that he was entitled of right to the live testimony of his requested witnesses and that Officer Hawkins and Mr. Finkbeiner should have testified.[17] The Superintendent reversed the decision of the Committee on this final ground (*i.e.*, the failure of Hawkins and Finkbeiner to testify). The plaintiff thereupon filed this § 1983 action against the Superintendent who had reversed the decision against him and the Chairman of the Adjustment Committee, the defendant Gardner.

In his complaint the plaintiff stated his cause of action against the defendant Gardner in these words:

"Plaintiff contends that Chairman Gardner knew that the charge was false, and this is why he did not want plaintiff's, witnesses present and the accusing officer's [sic] who were Mr. Finkbeiner and Officer Hawkins, and plaintiff's witnesses names were M. Moore # 105266; B. Arnold # 103942; Orpiano. All witnesses were not allowed to be present."

Gardner, as well as his co-defendant Johnson first moved for summary judgment. That motion was denied. The cause thereafter came on for trial. In his testimony at the trial the plaintiff explained his objection to the use of the statements of his witnesses at the disciplinary hearing as follows: "Statements were read into the record, but you really couldn't understand what he was saying (referring to the Chairman Gardner) because he was reading too fast." This was the stated reason whereby he found error in the Chairman's challenged ruling. He, also, raised the point that neither Hawkins nor Finkbeiner was present.

*Ibid.*, Section H, subsection 2, f.

But, on the merits of the charge itself, he admitted that there was a "general scuffle" involving Graham and the officers who were trying to subdue and control Graham. During this scuffle the plaintiff kicked Graham. Unlike his testimony before the Adjustment Committee, he claimed that when he kicked Graham, the latter was "trying to stab" him, and "was attacking" him. In short, he was asserting self-defense in repelling an attack from Graham and not intervention with the officers after the latter had brought Graham under control and had him defenseless on the ground. Such a defense hardly seems to fit in with the fact that he kicked Graham "in the ass," while Graham was on the ground with apparently his back to the plaintiff. That is an odd defense, under the circumstances, one which is about as credible as the claim of self-defense where the victim had been admittedly shot in the back.

Gardner testified in his own defense. He asserted his good faith and denied any malice toward the plaintiff. He added that, while he had seen the plaintiff in the prison, he knew nothing about him and specifically had no bias of any kind against him. This testimony of Gardner was not disputed by the plaintiff.

The district court's findings of fact and conclusions of law at the conclusion of the testimony, as they related to the defendant Gardner, were:

"The case against Mr. Gardner arises out of his participation as the chairman of the Adjustment Committee. And the complaint basically is that Mr. Ward (the plaintiff) considered himself charged with interfering with officers and did not feel that [evidence] should have been introduced concerning his kicking another inmate.

---

**16.** The first ground was a claim of alleged variance between the charge on which the plaintiff was tried and that on which he was convicted. This was the same ground asserted by the plaintiff and his adviser at the disciplinary hearing itself. However, the charge itself always was "delaying, hindering or interfering" with an officer in the performance of his duties.

**17.** Neither Hawkins nor Finkbeiner had been listed by the plaintiff as a witness whom he wished to be present at the hearing, nor was either listed by the reporting officer on the notice of charge and hearing as a witness who would be present at the hearing.

"Mr. Ward takes exception to the Adjustment Committee's finding that the conduct of kicking another inmate was interfering with the work of the officers. The Court disagrees, because the Court finds that the evidence before the Adjustment Committee was that the rampant inmate, Mr. Graham, had been brought under control by Corporal Goode and had been subdued before the kicking took place."

The Court found, also, that it was probable that the plaintiff had not requested the presence of Hawkins and Finkbeiner and that the "loss of eight occasions to be out in the prison yard or in the recreation yard is [not] of a constitutional dimension, and I so hold." It accordingly dismissed the action against the defendant Gardner.[18]

On appeal to this court the plaintiff has confined his claim of constitutional error to the denial by the defendant Gardner of his right to call and cross-examine his listed witnesses at the disciplinary hearing. The panel opinion found that this denial of the right of the plaintiff to call his witnesses was a violation of the plaintiff's procedural due process rights.[19] It based this conclusion on its construction of the decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which, in its view, held that an inmate facing a disciplinary hearing had an absolute right to call witnesses in his behalf unless "to do so [would . . . be unduly hazardous to institutional safety or correctional goals."[20] It seemingly recognized no right to refuse to call witnesses whose testimony would be irrelevant or repetitious. Having found that there was no showing that "institutional safety or correctional goals" would have been hazarded by calling the witnesses re-

quested by the plaintiff in this case, it concluded that there had been a constitutional deprivation of the plaintiff's procedural due process rights as a result of the defendant Gardner's action in refusing to call the witnesses because, in his opinion, their testimony would be irrelevant and cumulative. However, it declared the plaintiff had failed to show any special injury because of this constitutional deprivation beyond the loss of eight recreational periods. Under the circumstances, it concluded that the plaintiff was entitled to recover only nominal damages, which it fixed at $1.00. The dissent would, however, have granted Gardner immunity and have dismissed the action. Upon proper motion, we granted *en banc* rehearing of the cause. We now affirm the dismissal by the district court of the action against Gardner but on grounds different than those assigned by that court.

The critical question on appeal, as we perceive it, is whether Gardner, in ruling as he did during the disciplinary hearing on the right of the plaintiff to the testimony of the three witnesses requested by the plaintiff at the disciplinary hearing, enjoyed immunity, whether absolute, qualified or both. In resolving this question, we assume at this stage of the appeal that the panel opinion is correct in its conclusion that a prison inmate at a disciplinary hearing is constitutionally entitled to present live witnesses save in the sole instance where it can be fairly said that institutional safety or goals will be jeopardized, though we hasten to add, as we later observe, we do not think that either *Wolff* or the later case of *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) is so limited. With that assumption, however, we find

---

**18.** The district court, also, dismissed the action against Johnson. Since there is no appeal from this dismissal, we have not reviewed the allegations or evidence offered against such defendant on the grounds as stated by the district judge for dismissal of the action against Johnson.

**19.** Reported, 667 F.2d 1126 (1981).

**20.** The relevant language of the panel opinion on this dispositive point was:

"Based upon *Wolff* and *Baxter* [425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)], we are of the view that a prisoner faced with disciplinary proceedings resulting in a loss of good time or disciplinary confinement has a constitutional right to call witnesses in his defense when permitting him to do so will *not be unduly hazardous to institutional safety or correctional goals.*" 667 F.2d at 1130.

that the defendant Gardner enjoyed absolute immunity in connection with his rulings on the evidentiary issues in the disciplinary hearing such as that challenged on this appeal, under the reasoning of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the authoritative decision on official immunity.

In *Butz* the Supreme Court declared that "[a]lthough a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, our decisions recognize that there are some officials whose special functions require a full exemption from liability."[21] It proceeded to identify certain of those officers whose "special functions" had been properly found traditionally and constitutionally to afford them absolute immunity from liability for mistakes of judgment, whether of law or fact. These, among others, were judges, jurors, grand and petit, prosecutors and witnesses.[21a] *Butz,* however, broadened this constitutional rule of absolute immunity to include certain members of the executive branch, both federal and state, whose participation and role in administrative adjudicatory proceedings could be said to be " 'functionally comparable' to that of judge"[22] in the typical judicial proceedings. The Court emphasized that the applicability of the broadened rule of absolute immunity to include certain administrative proceedings under the "functional comparability" test of *Butz*[23] did not depend on the title or status in the bureau-cratic hierarchy of the officer concerned[24] but on whether the officer's action complained of involved the "performance of a judicial or quasi-judicial function." Accordingly, immunity under the rule would not attach to administrative or investigative actions or to actions without the officer's jurisdiction or in a proceeding lacking the normal characteristics or attributes of a judicial proceeding with "many of the same safeguards ... available in the judicial process." And *Butz* spells out generally these "safeguards" present in judicial proceedings, which will give rise to a right of absolute immunity in the context of an administrative proceeding. Such "safeguards," as outlined by the Supreme Court, "safeguards" which distinguish the "formal" from the "informal" administrative adjudications noted in 92 Harv.L.Rev. at 270 (quoted in note 23), are: (1) the administrative proceedings should be "adversary in nature;" (2) the officer exercising the adjudicatory power in the administrative proceeding should not be subject to supervision or direction of other employees engaged in investigative or prosecutorial duties; (3) a party should be entitled to offer either oral or written relevant and non-repetitive evidence on his behalf; (4) the record of the proceedings should be duly recorded and, so recorded, should constitute the exclusive record for decision; (5) the proceedings should be so structured as to assure the exercise by the officer in his decision of independent judgment on the

---

21. 438 U.S. at 508, 98 S.Ct. at 2911.

21a. *Burke v. Miller,* 580 F.2d 108, 109 (4th Cir. 1978).

22. 438 U.S. at 508–17, 98 S.Ct. at 2911–2916.

23. *See* the Supreme Court, 1977 Term, 92 Harv. L.Rev. 5, at 269–70, n. 35:
"Given this result, the Court seems correct in its extension of absolute immunity to the administrative adjudicatory officials discussed above. Its analysis of the institutional and functional comparability of these officials to judges and prosecutors [and we might add, magistrates, *Timmerman v. Brown,* 528 F.2d 811, 814 (4th Cir. 1975)] appears sound. While the Court did not limit possible exceptions to these adjudicatory officials, the significance placed on the institu-tional procedures that restrain their conduct suggests that absolute immunity will not be granted where comparable safeguards are absent. Thus, the exceptions appear limited to participants in 'formal agency adjudication,' and likely will not be extended to 'informal adjudication,' which typically involves 'a wide spectrum of conferences, discussions and settlements outside the framework of a formal hearing.' "

24. *Barr v. Matteo,* 360 U.S. 564, 572–73, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959), states that official immunity "is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government."

evidence before him; (6) the proceeding should be such as to prevent the danger of retaliatory response by the disappointed inmate to an adverse decision; and (7) there should be reasonable opportunity for the party involved to challenge by appeal the decision.[25] So long as those exercising administrative adjudicatory powers are subject generally to these restraints, with their reasonable tendency to reduce the need for a judicial remedy to deter unconstitutional conduct, they "are entitled to absolute immunity from damages liability for their judicial acts.[26] Those who complain of error in such proceedings must seek agency or judicial review." [27]

■ It would seem fairly clear that the action of the defendant Gardner has the typical characteristics of a "formal" adjudicatory decision involving as it did none of that " 'wide spectrum of conferences, discussions and settlements outside the framework of a formal hearing' " that mark an "informal" hearing [28] for which there is not absolute immunity. The action by Gardner providing the basis for plaintiff's claim of a constitutional deprivation was a ruling by him in his capacity as Chairman of the Adjustment Committee on the relevancy of testimony in the course of a formal hearing itself. Under the Guideline of the Division of Corrections that was the Chairman's responsibility. Under the Guideline he was explicitly authorized to rule out testimony or statements of witnesses which he found to be irrelevant or repetitious. As we later construe both *Wolff* and *Baxter*,[29] this right to exclude irrelevant and repetitious witnesses or testimony is recognized and upheld. Whether Gardner's ruling in exercising that right was correct or not would,

however, not affect his right to immunity any more than the correctness of a judge's evidentiary ruling would affect his right to absolute immunity. Manifestly, Gardner in ruling on the relevance and repetitiousness of the statements of the inmate witnesses, was acting within his authority and was performing a function which is performed by a judge in the normal judicial proceeding. To this extent there is obvious "functional comparability" between a judge's action in a judicial proceeding and Gardner's action as the Chairman of an Adjustment Committee in ruling on the admissibility of evidence in a disciplinary hearing.

Moreover, proceedings before the Adjustment Committee involving a charge of a "Major Violation" by a prison inmate are "adversary in nature," again as typical in judicial proceedings. The inmate is entitled in such proceedings to be represented by counsel or, if he elects, to be afforded the assistance of a fellow prison inmate; he has a right to confront and cross-examine his accusers, either personally or by his lawyer or inmate adviser; he has a right to present either oral testimony or written statements in his behalf; and his lawyer or inmate adviser may "in addition, present arguments in behalf of the accused inmate." Finally, the Guideline concludes with this paragraph:

"It is the purpose of the Adjustment Committee process to discover the truth regarding the charges against an inmate. In this connection, the Chairman should encourage anyone present for a hearing to ask any relevant question or make any statement which tends to make the truth more apparent." [30]

---

25. *Simons v. Bellinger,* 643 F.2d 774, 779–82 (D.C.Cir.1980) summarizes these several criteria to be applied in determining absolute immunity into three tests. Ours, we believe, is more definite and specific in its identification of the critical tests.

26. A number of decisions have declared that the immunity does not protect injunctive or declaratory relief.

27. 438 U.S. at 514, 98 S.Ct. at 2914.

28. *See,* 92 Harv.L.Rev. at 270, n. 35, quoted in note 23.

29. *See* our later discussion of this point in relation to possible qualified immunity.

30. Section H, subsection 2, d, iii.

It is significant that these regulations and *Guidelines* of the Virginia Department of Corrections go beyond what is constitutionally required by *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, in prison disciplinary hearings. As we have observed, under

Significantly, the regulations and the Guidelines are carefully drafted to insulate not only the Chairman but all members of the Adjustment Committee from any outside influence or partiality and to assure that the decision on guilt or innocence is made "exclusively" on the record as made at the hearing. Thus, they provide certain very definite "safeguards" intended to assure that all persons on the Adjustment Committee be "as unbiased as possible" and that any "appearance of impropriety" be avoided. No one who was the reporting officer, the reviewing officer, or "any other employees who witnessed the events surrounding the alleged offense, or who spoke to anyone concerning the offense, or who by any other means became familiar with the facts of the alleged offense *so as to render any verdict on the facts improper* because of such prior knowledge or involvement" can serve on the Committee (Italics added). Further, the Guideline enjoins the Committee members that they "shall listen to all testimony offered by the reporting officer, accused inmate and all witnesses .... shall require the reporting officer and all witnesses to provide all details concerning the alleged offense ..., shall question each witness as the need arises in order to clarify in their own minds the facts surrounding the

alleged offense," [and] "shall, in deciding whether or not an inmate is guilty, consider only the facts presented by testimony or by report."[31] It is only after the determination of guilt or innocence is made that the Committee may even examine the inmate's "institutional file" and then solely for the purpose of "setting a penalty for the offense." The Guideline as thus detailed is about as specific and exacting as that applicable to a judge in seeking to insulate the hearing officer from bias or prejudice, or from outside influence or pressure in resolving the issue of guilt or innocence.

There is also unquestioned authority in the Guideline for an appeal by the inmate in order to challenge any ruling made by the Chairman during the hearing or the decision of the Committee itself. When the violation is within the classification of a "Major Violation" as in this case, an aggrieved inmate has not one but actually two levels of appellate review. First, he may appeal to the Superintendent or Warden of the institution itself, and, if he is not satisfied with the decision of the Superintendent, he may then appeal to the Deputy Director of the Division of Adult Services in the central offices of the Division of Corrections[32] by noting an appeal within ten (10)

the Virginia Guidelines the prisoner, where the charge involves a "Major Violation," is entitled to private counsel. In *Wolff* the Supreme Court said:

"At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." 418 U.S. at 570, 94 S.Ct. at 2981.

Moreover, the assistance of a fellow inmate is required or allowed under *Wolff* only if "an illiterate inmate is involved" or "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case." 418 U.S. at 570, 94 S.Ct. at 2981. The Virginia procedure, on the other hand, gives the prison inmate in a "Major Violation" case the absolute right to private counsel or a fellow inmate's assistance, at his option, and does not restrict the right to the assistance of a fellow prisoner, as did the Supreme Court, to an illiteracy condition or complexity of the charge.

Again, the Virginia procedure gives the prison inmate the right to confront and cross-ex-

amine those charging him with an offense. The Supreme Court in *Wolff,* however, said that "it does not appear that confrontation and cross-examination are generally required in this context. We think that the Constitution should not be read to impose the procedure at the present time and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination." 418 U.S. at 568, 94 S.Ct. at 2980. *See also, Langton v. Berman,* 667 F.2d 231, 233–34 (1st Cir. 1981).

31. *Ibid.,* H 4, a, iii (underscoring in text); H 3, a, and b.

32. This Division, whose duties embraced the "management of this system of establishing guidelines and procedures," was, subsequent to these proceedings, abolished and was replaced by a "Regional Director," to whom the appellate powers were transferred. Further, the time for noting an appeal was extended to 30 days after the Superintendant's or Warden's decision. Since this change occurred after this proceeding had been concluded at the administrative level, it is irrelevant to the issue in this case.

days after the Superintendent or Warden has approved or modified the decision of the Adjustment Committee. The Deputy Director has the same right to approve or disapprove the decision of the Committee as had the Superintendent or Warden. Nor are these empty rights of appeal as the record in this case amply proves. The plaintiff did appeal the decision of the Adjustment Committee to the Warden or Superintendent in this case and he was sustained with the result that all record of his conviction by the Adjustment Committee was "expunged." It would thus appear clear that, both in his rights at trial and in his rights of appellate review, the Guideline is so drafted and applied as to provide the inmates with those "safeguards" which *Butz* suggests will warrant absolute immunity for the members of the Adjustment Committee in their various rulings at trial.

Finally, there can be no dispute that if absolute immunity is denied in this case, the members of the Adjustment Committee involved in prisoner disciplinary hearings in Virginia will be subjected to a real threat of burdensome and expensive litigation, much of it in "retaliatory response" to the decisions of the Committee. The proclivities of prison inmates to engage in litigation are prodigious. It has been estimated that between 30 and 40 percent of our appeals in this Circuit concern proceedings by prison inmates.[33] That burden on the courts will be immeasurably increased by allowing suits arising out of disciplinary hearings which have been as carefully structured as this one has been in order to provide every reasonable "safeguard" of an inmate's right to a fair and impartial hearing within the prison context. It is of no moment that the award in such case—as it was in this case—may be but a dollar. The award, however, minimal, would carry with it a right to attorney's fees, which could run into a substantial sum. And while generally the State provides the officer sued with counsel, this is not obligatory on the State and, if the claim is only against the officer personally, it is by no means certain that the State will give the same attention to the defense where it is only the personal liability of the officer which is at stake, as it would if a judgment against the State itself were threatened. This suggests that a prison officer, sued in a case such as this, should give serious consideration to retaining personal counsel at his own expense.

Moreover, lawsuits, whether meritorious or not, are always burdensome, harassing, and time-consuming. It is difficult enough to secure qualified prison employees. That task will be made more difficult, particularly in securing officials to serve on Adjustment Committees, if, however fair they try to be, such officials are subjected to the hazards of repeated litigation by disappointed defendants in disciplinary hearings. Ordinarily, prison officials are not generously rewarded for their services and the threat of an award against them personally would be a hazard many would feel themselves not justified in risking. The prison system itself will also likely be seriously hampered by a denial to the members of the Adjustment Committee absolute immunity, since prison employees will unquestionably be resistant to accepting appointment as members of an Adjustment Committee if acceptance entails the serious hazard of being sued personally for their actions strictly as members of the Committee.

For all these reasons, the claim of absolute immunity in favor of the defendant Gardner falls manifestly within the criteria fixed by *Butz* for absolute immunity. We would not be misunderstood, however. We are not concluding that in connection with all prison disciplinary hearings the members of the Adjustment Committee enjoy absolute immunity. Perhaps this case would be different if the plaintiff had been denied absolutely any "adversary" hearing or if he had been denied any notice of the charge against him, or if he had been denied the right to confront and cross-examine his accusers at the disciplinary hearing (though this right is circumscribed in *Wolff*), but

**33.** For an excellent statement of this problem, see Judge Phillips' *Foreword* to the current *Fourth Circuit Review*, 39 Wash. & Lee L.Rev. 425, particularly pp. 425–26 (1982).

that is not the claim of error here. What the panel opinion found in this case to be not merely an error but an error of constitutional dimensions is a simple evidentiary ruling that, after the plaintiff had candidly admitted that during the prison disturbance he had kicked Graham "in the ass" after the latter had been wrestled to the ground by the officers and was under the control of the officers, any testimony of the plaintiff's witnesses that would have been necessarily cumulative or contradictory of the plaintiff's own admission would have been inadmissible. To refuse to accept testimony of such a type is not an unusual ruling to be made in a judicial proceeding.

■ It is highly unlikely that, if a similar ruling had been made in a state criminal trial, for instance, we would in later habeas proceedings have found constitutional error. Errors in the admission or exclusion of evidence in a state criminal trial rises to the level of a constitutional deprivation *only* if the error is of such magnitude as to deny fundamental fairness. *See Lisenba v. California,* 314 U.S. 219, 227–28, 62 S.Ct. 280, 285, 86 L.Ed. 166 (1941); *Freeman v. Slayton,* 550 F.2d 909, 911 (4th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1150, 51 L.Ed.2d 566 (1977); *Chapman v. State of Maryland,* 516 F.2d 1277, 1278 (4th Cir.), *cert. denied,* 423 U.S. 935, 96 S.Ct. 293, 46 L.Ed.2d 267 (1975); *Grundler v. State of North Carolina,* 283 F.2d 798, 802 (4th Cir.), *cert. denied,* 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738 (1960); *Bryson v. State of Alabama,* 634 F.2d 862, 865 (5th Cir. 1981); *Smith v. Warden, Maryland Penitentiary,* 477 F.Supp. 500, 501 (D.Md.1979); *Foster v. Watkins,* 423 F.Supp. 53, 55 (W.D.N.C.1976), *aff'd.,* 570 F.2d 501 (4th Cir. 1978). Certainly, there was no fundamental unfairness in the evidentiary ruling by Gardner in this case. The three witnesses listed by the plaintiff could have added nothing by their testimony that could have changed the effect of the plaintiff's own admission on the issue of plaintiff's guilt. To repeat: It is in the context of ruling on the admissibility of such evidence and not on the right of the plaintiff to an adversary hearing after notice of charges that we find that the defendant Gardner enjoyed absolute immunity.

■ Our ruling illustrates the principle that every case in which immunity is claimed for members of the Adjustment Committee should be considered on its own facts and with reference to the particular procedure under which the disciplinary hearing is held. To qualify for absolute immunity, the action involved must be of a judicial character and the procedure followed in connection with the hearing must include the "safeguards" of a fair and impartial proceeding as stated in *Butz.* Thus, absolute immunity will not attach to action taken by the members of a Committee whose functions may be properly classified as administrative or investigative rather than adjudicatory. Moreover, the procedure followed in the hearing must insure for the accused inmate, as far as reasonably practical, similar rights to those the typical judicial defendant would be entitled to before a tribunal realistically insulated from prejudicial influences or bias and from whose rulings and decisions the inmate would have an effective means of appeal. Where such rights are not so "safeguarded," the criteria for absolute immunity as established in *Butz* are not met.

There are a few cases involving a claim of immunity in favor of the members of a prison disciplinary committee in which absolute immunity was denied precisely because the procedure mandated did not accord the accused inmate sufficient "safeguards" of fairness and impartiality to qualify under *Butz.* Such cases are, however, easily distinguishable from the case under review. *Hilliard v. Scully,* 537 F.Supp. 1084 (S.D.N.Y.1982), the most recent of these cases, is typical of these cases where absolute immunity under § 1983 was denied the members of the prison Adjustment Committee because the procedure for hearing before the Committee failed to give the accused inmate the necessary "safeguards" of a fair and impartial hearing sufficiently similar to those a defendant would have enjoyed in a judicial proceeding. The Court emphasized

that "the proceeding [in that case was] not of an adversarial nature and inmates [were] severely limited in the presentation of their cases. They [were] not entitled to retained or appointed counsel, nor [were] they entitled to crossexamine witnesses against them . . . ." [34] The members of the Committee were appointed by the Superintendent of the institution after he had reviewed the charges and found that the charges met "departmental rules and regulations." [35] That procedure is quite different from that under the Virginia Guideline, which provides for an "adversarial" proceeding, where the inmate may be assisted by counsel or by a fellow inmate, may confront and cross-examine his accusers, and present his witnesses or their statements, if relevant and not repetitious, before a Committee whose impartiality is protected against prejudice with as exacting a standard as jurors selected for a judicial trial.

Similarly, in *Mary and Crystal v. Ramsden,* 635 F.2d 590 (7th Cir. 1980) the procedure for the trial of inmates at a female juvenile center was properly found not to offer sufficient "safeguards of fairness and impartiality" to mandate absolute immunity for the members of the institutional committee holding inmate misconduct hearing. The "[g]irls accused of misconduct [under the procedure] were not allowed to have an advocate at the hearing, were not allowed to have their own witnesses at such a hearing (although the committee did sometimes interview other persons involved in the incident), and were not given the opportunity to confront [or to cross-examine] any witnesses against them." [36] It is obvious that that procedure is far removed from that mandated by the Guidelines of the Virginia Department of Corrections.

In *Jihaad v. O'Brien,* 645 F.2d 556 (6th Cir. 1981), the hearing of a charge that the plaintiff-prisoner had refused an order to shave his beard resulted in a § 1983 action against the members of the Institution Discipline Committee. The members of the Committee, it would seem, asserted at trial in the district court only a "good faith" or qualified immunity defense, though on appeal they raised both absolute and qualified immunity. Without any real discussion of the disciplinary procedure followed by the Committee, the court dismissed the claim of absolute privilege with the statement: "[w]e do not believe that a prison official who conducts *an informal disciplinary hearing* is in one of 'those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business' " and proceeded to find for the defendant on his qualified immunity defense.[37] In essence, the inmate in this case appears to have been given none of the "safeguards" outlined in *Butz.*

Contrary to these cases, the Virginia procedure places every reasonable constraint on any unfair or prejudicial influence upon the Adjustment Committee and seeks to arm the accused inmate with every procedural right he would have enjoyed if tried in a court. His appellate rights extend beyond those at his institution to a separate division of the Department of Corrections reasonably removed from the influence of any one at the state institution where the alleged infraction occurred. This case presents, as we have said, a case which fits fully the test of "functional comparability" on the part of the members of the Adjustment Committee, as stated in *Butz,* for absolute immunity. Cf., *Birch v. Mazander,* 678 F.2d 754, 756 (8th Cir. 1982).

Though we are convinced and so hold that the defendant Gardner under the facts of this case was entitled to absolute immunity from an award of damages in favor of the plaintiff, we would perhaps be remiss not to take note of the possibility that the defendant Gardner may have been likewise qualifiedly immune from damages liability. In *Butz* the Supreme Court declared categorically that, "Federal officials will not be liable for mere mistakes of judg-

---

**34.** 537 F.Supp. at 1089.

**35.** 537 F.Supp. at 1089.

**36.** 635 F.2d at 594, n. 1.

**37.** 645 F.2d at 561 (italics added).

ment, whether the mistake is one of fact or one of law," [38] and that what controls the liability of federal officers applies with equal force to state officers under § 1983.[39] A state official was said "to lose his immunity from a § 1983 suit only if 'he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person]' [or prisoner].... We emphasized, however, that, at least in the absence of some showing of malice, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was 'clearly established' at the time of the violation." [40]

As the last term ended, the Supreme Court in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), reiterated (with one amendment later stated) the rule stated in *Butz* and *Wood:*

"We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [41]

The Supreme Court added that a "threshold immunity question" in every action against a public official, whether federal or state, exercising discretionary functions is "whether [the currently applicable law] was clearly established at the time an action occurred." It proceeded to declare that "[u]ntil this threshold immunity question is resolved, discovery [or further proceedings in the case] should not be allowed." In resolving this "threshold" question, the con-

trolling principle was stated to be that "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Contrary to prior decisions, including *Butz,* it dismissed as inappropriate in resolving this question any "subjective" inquiry into the "good faith" of the official involved. Finally, it concluded that it was appropriate for the judge to "determine, not only the currently applicable law, [and] whether that law was clearly established at the time an action occurred" and that, if the court determined that it was not "clearly established" at that time, a grant of summary judgment, based on the official's qualified immunity right, was in order.[42] This result was found to be justified in order that the willingness of "citizens [to accept] public office" and be "unflinching in the discharge of their duties" might not be chilled by the threat of "the expenses of litigation" and the public interest might not be prejudiced by "the diversion of official energy from pressing public issues" to the defense of, what in many instances are "[i]nsubstantial lawsuits" against public officials.[43]

The initial "threshold" question thus to be answered in resolving the claim of qualified privilege in this case would be whether the right which the plaintiff claims was violated by Gardner was "clearly established" at the time of the alleged violation. If it was not, Gardner is plainly immune from liability under *Butz,* as restated in *Harlow v. Fitzgerald.* The constitutional right which the defendant Gardner was alleged to have violated was the denial of the plaintiff's right to call live witnesses in his defense at his disciplinary hearing on the

**38.** 438 U.S. at 507, 98 S.Ct. at 2911.

**39.** 438 U.S. at 500, 98 S.Ct. at 2907. *See also, Harlow v. Fitzgerald,* --- U.S. ——, —— n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982).

**40.** 438 U.S. at 498, 98 S.Ct. at 2906. *See also, Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Procunier v.*

*Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

**41.** —— U.S. at ——, 102 S.Ct. at 2738.

**42.** —— U.S. at ——, 102 S.Ct. at 2738.

**43.** —— U.S. at —— and ——, 102 S.Ct. at 2736 and 2737.

grounds that their testimony would have been irrelevant or cumulative. It cannot be said that a right to present at a prison disciplinary hearing witnesses, especially if their testimony was found by the hearing officer to be irrelevant to the issues before the Committee, was "clearly established," at least in this Circuit, at the time of the disciplinary hearing in this case. The plaintiff herein conceded as did the panel opinion that a contention that such right to call "live witnesses" at such a hearing to present what the hearing officer conceived to be irrelevant or cumulative evidence was contrary to certain published "authority in this Circuit." It was recognized by both the plaintiff and by the panel opinion that *Pollard v. Baskerville,* 481 F.Supp. 1157 (E.D. Va.1979), aff'd., 620 F.2d 294 (4th Cir. 1980), (table), had upheld expressly the right of the disciplinary committee in its discretion to refuse to hear live testimony on behalf of an inmate at a disciplinary hearing.[44] We, however, were cited an unpublished opinion which was contrary to the statement in *Baskerville, Bratten v. Smith,* 649 F.2d 862 (4th Cir. 1981). The contention seems to be that the two contradictory opinions cancel each other, leaving this Circuit with no authority on the point. What the plaintiff, as well as the panel opinion overlooked, however, was that the ruling in *Baskerville* was published and that the ruling in *Bratten* was not. Gardner could hardly be charged with notice of *Bratten.* The only decision of which he could possibly be charged with notice is the district court opinion in *Baskerville,* which was affirmed by us without opinion in 620 F.2d 294, and the panel opinion seemingly agrees that *Baskerville* would provide a legal justification for Gardner's action. If, however, we assume that *Baskerville* and *Bratten* are contradictory in their rulings—as has been suggested—that fact, it would seem, would mean that the law as stated in those two cases was in doubt and was not clearly established in this Circuit. The plaintiff seems to respond to this suggestion by contending that, whether the decisions in this Circuit are in confusion, the decisions of the Supreme Court are not and that they "clearly established" the plaintiff's right to the live testimony of his witnesses. However, it must be remembered that the district judge who decided *Baskerville* and the three judges of this Court who affirmed without opinion the district court's decision in *Baskerville* did not think the right of the plaintiff was "clearly established." And if these four judges were uncertain, is it fair to find the defendant Gardner liable because he, too, was uncertain? It should be added that the four judges who participated in the *Baskerville* decision are absolutely immune from damages liability, whether their legal conclusion was in error or not. Under the plaintiff's contention, Gardner though, is to be found liable because he was not more perceptive of constitutional principles in this case than four federal judges of this Circuit (3 Circuit Judges and 1 District Judge) in *Baskerville,* a somewhat unreasonable result.

Actually, though, neither *Wolff* nor *Baxter,* in our opinion declares absolutely that, at a prison disciplinary hearing, the testimony of a witness whose testimony is cumulative or irrelevant may not be found inadmissible. In the very paragraph in *Wolff* relied on by the plaintiff the Supreme Court posited that "it would be useful for the [Adjustment] Committee to state its reason for refusing to call a witness, whether it be for *irrelevance,* lack of necessity, or the hazards presented in individual cases," though it prefaced such statement with the declaration it was not "prescrib[ing] compliance with such sugges-

---

**44.** In *Baskerville,* the Court said (481 F.Supp. at 1161):

"The plaintiff [in a § 1983 suit arising out of a prison inmate's disciplinary hearing before a prison panel] places undue reliance on *Wolff v. McDonnell,* . . . , in support of his claim that he was entitled, as a matter of right, to the presence of his witnesses. In *Wolff,* the Supreme Court did not go so far as to set a constitutional requirement that inmates be allowed to call witnesses in his defense at his hearing. Rather, this was judged to be a matter within the discretion of prison authorities."

tion."[45] This exact language was quoted in *Baxter v. Palmigiano,* 425 U.S. at 321, 96 S.Ct. at 1559, and later in that same opinion (on page 322, 96 S.Ct. at 1559) the Supreme Court struck down a requirement imposed by the Court of Appeals in that case that "absent explanation, failure to set forth reasons related to the prevention of one or more of the four concerns [one of which is irrelevant] expressly mentioned in *Wolff* would be deemed prima facie abuse of discretion." It appears quite reasonable to assume from these statements in both *Wolff* and *Baxter,* that the Supreme Court recognized that the Adjustment Committee had in any event a right to refuse to hear witnesses whose testimony might be irrelevant or cumulative [*i.e.,* lack of necessity].

It should probably be observed, too, that if the Adjustment Committee were without the right to exclude irrelevant or cumulative evidence—as apparently the plaintiff would argue—it would be subject to a more stringent rule than would the court itself in a judicial trial where both cumulative and irrelevant testimony may be excluded. *See Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974); *United States v. Dominguez,* 604 F.2d 304, 310 (4th Cir. 1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Clark,* 617 F.2d 180, 187 (9th Cir. 1980); *United States v. Peters,* 610 F.2d 338, 340 (5th Cir. 1980); and Rules 401 and 403 Federal Rules of Evidence. Under the judicial rule, whether the evidence is cumulative or irrelevant is normally within the trial court's discretion, to be disturbed only for abuse.[46] It would seem self-evident that the Chairman of the Adjustment Committee should be held to no higher standard in a disciplinary hearing than would a judge in a judicial proceeding.

Since it is plain that it is not "clearly established" in this Circuit or in *Wolff* or in *Baxter,* that the defendant Gardner as Chairman of the Adjustment Committee did not have the discretion to hold inadmissible testimony that he found to be irrele-

vant or cumulative, the defendant was entitled as a matter of law to qualified immunity for his evidentiary ruling, which is the subject of the alleged constitutional violation, whether the ruling was erroneous as an abuse of discretion or not. We reiterate, though, that we are of opinion Gardner was entitled to absolute immunity for his ruling.

For the reasons stated, we affirm the dismissal by the district court of the action against the defendant Gardner.

Accordingly, the judgment of the district court is

AFFIRMED.

K. K. HALL, Circuit Judge, concurring:

As I read the majority opinion, the law of this case is that under the facts presented, the defendant, Gardner, enjoys absolute immunity since he conducted a *formal* hearing in accordance with the guidelines of *Butz v. Economou.* I concur wholeheartedly in that determination. However, the opinion speculates that "Perhaps this case would be different if the plaintiff had been denied absolutely any 'adversary' hearing or if he had been denied any notice of the charge against him, or if he had been denied the right to confront and cross-examine his accusers at the disciplinary hearing...." This is pure dicta, which adds nothing to the case and seems to be sugar coating for a rule of law that I find is not bitter and needs no sweetening.

I concur, seeking refuge in the hope that the dicta in this case will be recognized as such and treated as unworthy of future consideration.

MURNAGHAN, Circuit Judge, concurring:

What Judge Russell has written concerning qualified immunity compellingly leads to the conclusion that the judgment of the district court should be affirmed. As for absolute immunity, the point is a complex one not requiring decision and should be

---

**45.** 418 U.S. at 566, 94 S.Ct. at 2979 (Italics added).

**46.** *Hamling,* 418 U.S. at 127, 94 S.Ct. at 2912.

left for the day when maliciousness is truly present and the question therefore truly arises. I write only to record that I abstain from deciding, as premature, the absolute immunity issue.

Judge Phillips authorizes me to state that he joins in this concurring opinion.

HARRISON L. WINTER, Chief Judge, dissenting:

I continue to think that this case is an inappropriate vehicle for considering the immunity, if any, which may be claimed by the chairman of a prison disciplinary committee. But, if as a result of the invitation of the dissenting panel member, defendant Gardner belatedly urges this defense and the court is determined to consider it, I find my views at variance with those of my brothers. Hence I write separately.

The majority holds that Gardner is entitled to absolute immunity for the evident error that he made in conducting the hearing which resulted in the denial of Ward's constitutional right to call witnesses in his behalf. It does so as an original proposition on its construction and application of *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The exact question before us, or one so similar as to be indistinguishable, has been considered by a number of other courts. In an unbroken line of authority, the ruling has been that prison officials enjoy only qualified immunity. *See Jihaad v. O'Brien*, 645 F.2d 556, 561–62 (6 Cir. 1981); *Chavis v. Rowe*, 643 F.2d 1281, 1288 (7 Cir. 1981); *Hayes v. Thompson*, 637 F.2d 483, 489–90 (7 Cir. 1980); *Bills v. Henderson*, 631 F.2d 1287, 1299 (6 Cir. 1980); *Bogard v. Cook*, 586 F.2d 399, 410–12 (5 Cir. 1978), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). *See also Craig v. Franke*, 478 F.Supp. 19 (E.D.Wis. 1979). There is no case which supports the view of the majority.

The cases which have held that prison officials, including members of a disciplinary adjustment committee, have only qualified immunity have all stemmed from the ruling in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

There, in the context of a prisoner's suit for interference with his mailing rights, the Court held that "prison officials and officers . . . were not absolutely immune from liability in this § 1983 damages suit and could rely only on the qualified immunity described in *Scheuer v. Rhodes* [416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)] and *Wood v. Strickland* [420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)]." *Procunier*, 434 U.S. at 561, 98 S.Ct. at 859. The majority, however, ignores these holdings and considers only *Butz v. Economou* as the "authoritative decision on official immunity." The majority's implicit assumption must be that *Butz* overruled *Procunier*. This premise is unacceptable to me in view of the fact that *Butz* cited *Procunier* with approval and relied on it and on *Scheuer* and *Wood*. *See Butz*, 438 U.S. at 496–98, 98 S.Ct. at 2905–07.

In focusing on one aspect of *Butz* to the exclusion of the other relevant immunity decisions, the majority overlooks a central theme of this area of our jurisprudence: *i.e.*, that where immunity is accorded to executive officials, qualified immunity is the rule and absolute immunity the rare exception. *See Scheuer*, 416 U.S. at 242–45, 94 S.Ct. at 1689. *See also Nixon v. Fitzgerald*, —— U.S. —— at ——, 102 S.Ct. 2690 at 2700, 73 L.Ed.2d 349 (1982); *Wood*, 420 U.S. at 320, 95 S.Ct. at 999. The *Butz* opinion itself was quite clear on this point and on the procedural corollary that "officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz*, 438 U.S. at 506, 98 S.Ct. at 2910. Just this past term, the Supreme Court reiterated that "[t]he burden of justifying absolute immunity rests on the official asserting the claim." *Harlow v. Fitzgerald*, —— U.S. —— at ——, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).

These repeated admonitions make clear that it is improper for a court to reach the issue of absolute immunity where that defense has not been litigated in earnest by the defendant official. But that is precisely

the situation here. If defendant Gardner pressed any issue bearing on immunity in the district court, it was the issue of his good faith—a matter which goes only to qualified immunity and is completely irrelevant to absolute immunity. On appeal, Gardner's initial brief dealt only with the question whether his conduct violated the Constitution or the guidelines of the Department of Corrections or otherwise amounted to an abuse of discretion. In no sense did the brief invoke a claim of immunity, whether qualified or absolute. Only after the dissenting panel member injected the immunity issue into the case did Gardner embrace the concept, and even then his supplemental brief for the in banc hearing. gave the immunity issue only cursory treatment in the space of a page and a half. I am at a loss to see how, on this record, it can fairly be said that Gardner bore the burden assigned him by *Butz* and *Harlow* of showing "that absolute immunity is essential for the conduct of the public business." *Butz,* 438 U.S. at 507, 98 S.Ct. at 2911 (footnote omitted).

In short, the question seized upon by the majority would be better left for another day. If the issue is to be addressed prematurely, however, I must also take exception to the majority's decision on the merits. The administrative law judges held absolutely immune in *Butz* are far different creatures from the members of a prison disciplinary committee. The former belong to a legally trained professional corps whose independence is guaranteed by numerous means under the Administrative Procedure Act; the latter are any "key" prison employees designated by the warden who lack direct knowledge of the matter to be adjudicated. Although disciplinary committee members must, under the applicable regulation, have a working knowledge of prison disciplinary regulations, *see* Va. Dept. of Corrections Guideline No. 861, VI(H)(1)(b), they are not required to have any knowledge of constitutional law or civil rights.

One of the linchpins of *Butz* is the presence of substantial safeguards to control unconstitutional conduct by the person granted immunity. The majority finds the safeguards here in a prisoner's right to appeal an adverse disciplinary action to the warden or superintendent of the institution and from him to an officer of the central state administration of the prison system. To me this "safeguard" is more illusory than real. I can hardly think that the prison head, whose duties include selecting the members of the disciplinary committee and deciding which member shall be chairman, is reasonably guaranteed to be an objective reviewing officer. Nor can the state department administering the prison system be expected to function as an impartial arbiter of conflicts between the institutional interests of the prisons and the rights of inmates. Without impugning the competence or integrity of prison administrators, I am unable to view this system of review as a reliable check on the discretion of prison disciplinary committees, nor can I accept disciplinary committee members as the functional equivalents of the administrative law judges immunized in *Butz.*

The mere fact that disciplinary committees exercise an adjudicative function does not entitle them to absolute immunity. The school board members who were defendants in *Wood* played a quasi-judicial role in disciplining the plaintiff students, yet the board members' claim of absolute immunity was rejected. 420 U.S. at 320–21, 95 S.Ct. at 1000. The prison disciplinary hearings from which the present case arose seem much more closely analogous, in form and function, to the school disciplinary system at issue in *Wood* than to the administrative enforcement process implicated in *Butz.* Under the applicable guideline, prison disciplinary hearings take place one to four days after the alleged infraction. *See* Va. Dept. of Corrections Guideline No. 861, VI(F)(2). The members of the disciplinary committee are not professional hearing officers but ordinary prison officials temporarily diverted from their usual duties. Although the committee's decisions are supposedly made on a reviewable record, transcripts of the proceedings—as amply demonstrated in this case—are often unintelligible at potentially significant points. To label such hearings

"formal," as the majority does here, is most unconvincing.

The majority's grant of absolute immunity rests, not only on the supposed "formality" of the prison disciplinary system, but also on the proclivity of prison inmates to engage in "burdensome and expensive litigation." Such a problem undoubtedly exists, but absolute immunity is neither an appropriate nor an effective means of solving it. *Butz* itself teaches that the Federal Rules of Civil Procedure provide the proper safeguard against frivolous suits. In withholding absolute immunity from certain federal executives, the *Butz* Court observed:

> Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive a motion to dismiss. Moreover, the Court recognized in Scheuer that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of [qualified] immunity. See 416 U.S. at 250 [94 S.Ct. at 1693].... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

*Butz,* 438 U.S. at 507–08, 98 S.Ct. at 2911 (footnote and parallel citations omitted).

The majority apparently assumes that the federal rules are inadequate to the task of separating substantial from insubstantial claims in the context of prisoner litigation relating to discipline. This is an assumption I cannot share, especially in view of the fact that the Supreme Court has recently modified the elements of qualified immunity to make that defense more susceptible to summary disposition. *See Harlow v. Fitzgerald,* —— U.S. —— at —— – ——, 102 S.Ct. 2727 at 2737–39, 73 L.Ed.2d 396 (1982). Under *Harlow,* qualified immunity no longer hinges on a factual inquiry into the defendant's subjective good faith but instead rests solely "on the objective reasonableness of [his] conduct, as measured by reference to clearly established law." *Id.* —— U.S. at ——, 102 S.Ct. at 2738 (footnote omitted). After *Harlow,* the majority's decision in the present case will add little to the ability of the courts to dispose of groundless claims quickly and efficiently. Indeed, the majority's opinion in this regard is largely self-defeating because it holds that absolute immunity does not attach to "all" disciplinary hearings. It states as a principle that "every case in which immunity is claimed for members of the Adjustment Committee should be considered on its own facts and with reference to the particular procedure under which the disciplinary hearing is held." The resources supposedly conserved by the majority's decision will surely be squandered if every case must be separately considered to determine whether or not the new rule of absolute immunity will apply.[1]

In my judgment, whatever gain today's decision may confer in terms of reducing meritless litigation is negligible in proportion to the extreme nature of the majority's chosen means—the complete insulation of a class of prison officials from liability for intentional or otherwise inexcusable violation of constitutional rights. *See Wood,* 420

---

1. The majority justifies a grant of absolute immunity on the additional ground that even an award of nominal damages "would carry with it a right to attorney's fees, which could run into a substantial sum." In practical terms, however, the opinion does little to allay this concern. Even under a rule of absolute immunity, a prisoner would be entitled to attorney's fees if he prevailed on a claim for injunctive or declaratory relief. *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 738–39, 100 S.Ct. 1967, 1978, 64 L.Ed.2d 641 (1980) ("The House Committee Report on the Act [authorizing fee awards in civil rights cases] indicates that Congress intended to permit attorney's fee awards in cases in which prospective relief was properly awarded against defendants who would be immune from damages awards."). *See also Wood,* 420 U.S. at 314 n. 6, 95 S.Ct. at 997 n. 6 ("immunity from damages does not ordinarily bar equitable relief"); *Timmerman v. Brown,* 528 F.2d 811, 813–14 (4 Cir. 1975) (same).

U.S. at 320, 95 S.Ct. at 999. The Supreme Court has repeatedly "recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." *Butz,* 438 U.S. at 506–07, 98 S.Ct. at 2910. I would adhere to these principles in the present case and therefore, if the immunity question is to be reached at all, I would recognize only a qualified immunity in favor of prison disciplinary officials. Under *Harlow,* our inquiry should be whether defendant Gardner "violate[d] clearly established . . . constitutional rights" when he refused to call plaintiff's witnesses at the disciplinary hearing. *Harlow v. Fitzgerald,* —— U.S. at ——, 102 S.Ct. at 2738 (1982).

I continue to believe that a prisoner's right to call witnesses at such a hearing was clearly established in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). I reject the notion that what has been unambiguously decided by the Supreme Court can be rendered ambiguous by the contrary decision of a district court and a summary affirmance by a panel of the court of appeals. *See Pollard v. Baskerville,* 481 F.Supp. 1157, 1161 (E.D.Va.1979), *aff'd mem.,* 620 F.2d 294 (4 Cir. 1980). In my view, moreover, Gardner's characterization of the proffered testimony as irrelevant or unduly cumulative was so unreasonable that it invokes no exception to plaintiff's right to call witnesses and indeed exceeds

the scope of qualified immunity.[2] Any serious doubt that can be admitted on these points simply underscores how far the majority has reached in order to cloak Gardner in absolute immunity. If the constitutional point in question was not clearly settled or if Gardner's determination was not unreasonable, the majority's every concern in this case could be amply resolved by applying the doctrine of qualified immunity.

Because to my mind today's decision is both unnecessary and unsound, I dissent.

Judge ERVIN authorizes me to state that he joins in this opinion.

---

**2.** In this connection, I must take issue with the majority's view of the facts. Noting that plaintiff admitted kicking another inmate, the majority apparently concludes that any further evidence was necessarily cumulative or irrelevant on the charge that plaintiff impeded officers who were engaged in quelling a fight. Although plaintiff did admit the kicking, he insisted that he acted in self-defense and that he kicked his assailant before the latter had been subdued by prison guards. In short, plaintiff squarely controverted the charge levied against him. The written statements of the three inmates whom Gardner refused to call at the hearing indicate that each of these witnesses would have corroborated some aspect of the

plaintiff's defense. Under the circumstances, their testimony may not reasonably be deemed irrelevant or cumulative, and Gardner's refusal to call them was an abuse of the discretion conferred by Va. Dept. of Corrections Guideline No. 861, VI(H)(2), as well as a violation of plaintiff's constitutional rights. The district court, of course, found that the record was not devoid of evidence supporting the disciplinary committee's determination that plaintiff kicked his assailant *after* the guards had subdued him. But the mere fact that some such evidence existed does not obviate plaintiff's right to present contrary testimony, nor does it render such testimony cumulative or irrelevant.