**George SEGARRA, Appellee,**

v.

**M.J. McDADE, Ralph Edwards, Appellants.**

**No. 82–6170.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 10, 1982.

Decided April 26, 1983.

Rehearing and Rehearing En Banc Denied July 8, 1983.

Jacob L. Safron, Sp. Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N.C., on brief), for appellants.

William C. Stuart, III, Raleigh, N.C., for appellee.

Before MURNAGHAN and CHAPMAN, Circuit Judges, and MICHAEL,* District Judge.

CHAPMAN, Circuit Judge:

This case, an appeal from the District Court for the Eastern District of North Carolina, concerns the award of $1.00 in damages and $1500.00 in attorney fees for the purported denial of appellee's procedural due process rights. Appellee McDade had filed a *pro se* complaint under 42 U.S.C. § 1983 seeking only declaratory and injunctive relief for alleged violations of his civil rights. His complaint did not seek damages. We reverse the court below.

---

* Honorable James H. Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

1. Q. Mr. Segarra, did you ever refuse to submit a list of witnesses?
   A. You know, they ask you, "Do you want to have anyone to write a statement?" but it seemed like it'd be a *rush job, so I always—if you would look at my records you would see that I always say no.* (emphasis added).

## I

This case arose from events that occurred when George Segarra was an inmate housed at North Carolina Central Prison (Central) in Raleigh, North Carolina. On the date in question he had been an inmate at Central for a period of three years.

On July 6, 1978 Segarra was observed standing at a chain link fence talking with another inmate, one Julio Herencio. (Inmate Herencio was segregated from the general prison population in Indefinite Nonpunitive Segregation (IDS)). The two men were observed by Correctional Officer F.S. Walker who, in his statement, affirmed that as another officer approached, Segarra threw a napkin at Herencio. Walker approached Herencio, picked the napkin up from Herencio's feet and found that the napkin contained ten pills. The officer took the pills to the hospital pharmacy, which reported that the pills were not from its stock and that the pills were phenobarbitol.

Correctional Officer J.B. Phillips was assigned to investigate the incident. Approximately two hours after the action took place in the yard Phillips interviewed Segarra. Segarra refused to make a statement himself and stated he did not wish to have anyone else's statement taken. When questioned about this occurrence at trial, Segarra stated that he always refused to give out witnesses' names and to have statements taken from them.[1] Segarra also testified that he could have given Herencio's name and Phillips could have obtained the witness's statement to be submitted at the disciplinary hearing.[2]

Officer Phillips filed his report on July 6, 1978 and Inmate Segarra was given written

2. Q: And you could have given Julio Herencio's name to the Investigating Officer, Sergeant Phillips, and he could have obtained the same statement for you?
   A: He probably could have.
   Q: And then that would have been submitted to the disciplinary proceeding, right?
   A: Yes.
   Q: And that would have been considered by the Disciplinary Committee?
   A: I guess it would have. I couldn't swear to that.

notice of the offense and disciplinary report on July 7th, five days before the hearing.

At the disciplinary hearing on July 12th, Segarra plead not guilty to the charge of possession of drugs. The disciplinary committee considered the written statements of Officers Walker and Phillips. Segarra then testified that the pills were not his and that instead they belonged to Julio Herencio. It was at this juncture that Segarra attempted to have the committee consider a note purportedly written by Herencio claiming ownership of the pills.

The chairman of the committee, defendant appellant McDade, refused to let the committee consider this note. He refused to accept it because it was not possible to determine the authenticity of the letter. The letter was not dated, it was not addressed to the committee and it was not signed.[3]

The appellee then requested that Herencio be brought in from lockup to testify at the hearing. McDade refused to bring Herencio in to testify because: (1) the written and oral testimony offered sufficient evidence on which the committee could base a fair decision; (2) Segarra had refused the opportunity to name witnesses or have any statements taken; and (3) the Committee was trying to determine the question of possession, not ownership.[4]

The committee unanimously found Segarra guilty; and they suspended his television and recreational privileges for thirty days and took away thirty days of good conduct time. Segarra appealed this decision to the Warden. He attached to his appeal both the letter proffered to the committee and a statement made by Herencio. The record was reviewed by the deputy warden at defendant Edwards' direction. The deputy warden found that McDade had the discretion to exclude Herencio's testimony, there were no procedural errors; and in his opinion, the evidence supported the committee's decision. This decision was affirmed by the Warden on appeal.

Segarra, proceeding *pro se,* then filed this § 1983 claim in the district court. He sought expungement of the violation from the prison's records and alleged he had not been accorded due process. He did not seek monetary damages.

The parties agreed to have this case tried by magistrate. The magistrate, relying on the panel decision of *Ward v. Johnson,* 667 F.2d 1126 (4th Cir.1981) *rev'd en banc,* 690 F.2d 1098 (1982), found that a prisoner faced with loss of good time "has a constitutional right to call witnesses in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 667 F.2d at 1130. The magistrate, applying this rule, held that the refusal to call Herencio as a witness was a denial of Segarra's procedural due process rights guaranteed by the fourteenth amendment and, despite the fact that there had been no prayer for damages, awarded the plaintiff-appellee $1.00 in damages and $1500.00 in attorney's fees. This appeal followed.

We reverse the judgment of the district court for three reasons. First, the plaintiff did not seek monetary damages below: he only requested expungement of the record of the proceeding and a declaration that his due process rights had been violated. Second, Segarra did receive the process he was due under *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). And third, the decision below followed the precedent of our panel decision in *Ward v. Johnson;* that case, however, has been reversed by this court sitting *en banc.* Further, *Ward v. Johnson* held that members of disciplinary committees in a prison system are entitled to immunity.[5]

---

**3.** The letter was addressed to "Hey Bro" and signed "Later bro, J.J."

**4.** According to McDade's testimony, Segarra requested that he be allowed to bring Herencio to verify the letter and to testify that the pills were his. This testimony would involve owner-

ship and not the charged offense, possession, either actual or constructive.

**5.** Although Judge Russell discussed qualified immunity, he clearly stated the immunity was absolute. 690 F.2d at 1099, 1110–1114. Judge Murnaghan, with Judge Phillips joining him,

## II

■ Because the plaintiff did not request monetary damages, the defendants had no prior notice that they could be exposed to this liability. Although the damages awarded may have been nominal, the potential exposure to paying attorney's fees could be oppressive. The defendants should therefore be notified of this exposure before having to face the consequential liability. Further, in a § 1983 suit that seeks actual damages, a defendant is entitled to a jury trial. *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978); *Cook v. Cox,* 357 F.Supp. 120, 124–125 (E.D.Va.1973).[6] If a plaintiff was allowed to receive monetary damages without requesting them, a defendant could be deprived of his right to trial by jury because of a defect in notice; to allow this result can hardly be just.

## III

■ *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) delimitates the process that is due a prisoner in a prison disciplinary proceeding involving the loss of "good time" credits. *Wolff* requires two procedures, both of which Segarra received here: (1) written notice of the charges at least twenty-four hours before the hearing and (2) a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action. 418 U.S. at 564, 94 S.Ct. at 2969. The Court, however, stopped short of requiring witnesses in every instance.[7]

■ While stating that an inmate facing disciplinary proceedings should be allowed to call witnesses when it will not be unduly hazardous to institutional safety or correctional goals, the Court also recognized that this right was not unfettered. In fact, this case presents the very problem that the court recognized—the "obvious potential for disruption and for interference" with the necessary disciplinary action. 418 U.S. at 566, 94 S.Ct. at 2979.

At the time of the disciplinary hearing, Segarra had been housed at Central for three years. He had been before the disciplinary board before and he testified that he was familiar with the board's practice and procedure. Despite the fact that he was familiar with the procedure, he refused to make a statement, list any potential witnesses or have a statement taken from a witness. He later testified that he "always said no" when asked to make a statement or have a witness's statement taken. He also testified that he knew the investigating officer could have taken a witness's statement if he had requested it. There were five days between the date he was given notice of the charge and the date of the hearing, yet he requested no statements to be taken during this interim.[8] Instead, it was during the hearing, after his own testimony, that Segarra gave notice he wished to bring a witness in to testify to the ownership of the pills. The chairman concluded that such testimony was unnecessary to determine possession of the pills in light of the statement of the officer who testified that he had seen Segarra throw the pills to the ground. Segarra had offered his ver-

---

concurred in the result but stated that he felt it premature to decide whether such immunity was absolute and preferred to leave that question for a case presenting the question squarely. *Id.* at 1114.

6. *Cook v. Cox* held that persons seeking monetary damages under § 1983 must take their claim to a jury if either of the parties demands a jury trial. *Burt v. Abel* held that a plaintiff who alleges actual damages exceeding twenty dollars in a § 1983 action has the right to a jury trial. 585 F.2d at 616, n. 7.

7. Before reaching the substantive issues involved in *Wolff,* the Court reflected upon the nature of discipline in prisons and the special

consideration that must be given to the problems prison officials face when a court frames the constitutional requirements to be imposed upon those officials. 418 U.S. at 560 to 563, 94 S.Ct. at 2976 to 2978. The Court specifically stated that it would be unwise to apply a constitutional standard to the disciplinary procedures that would call for adversary proceedings typical of a criminal trial.

8. It is instructive to note that Segarra obtained a statement from Herencio to use during his appeal to the warden a few hours after the hearing. It was given July 12, 1978 at 10:30 a.m.

sion to the committee and the committee felt there was sufficient evidence to resolve the dispute of facts, unfortunately for Segarra, the committee accepted the correctional officer's version of the facts as being more credible.

The decision by the committee to omit the testimony of the witness was entirely within its discretion; it also was justifiable to avoid disruption and interference with the proceeding. The Supreme Court recognized in *Wolff* that courts must allow officials some degree of flexibility to refuse to call witnesses for several reasons. The court recognized the need for swift punishment, the necessity of keeping hearings within reasonable limits and the need to maintain authority. It also recognized that correction committees could refuse to hear witnesses because of irrelevance of testimony, lack of necessity and hazards in particular cases.[9] Here the committee was concerned with the possibility of disruption of the disciplinary process and the chairman explained that the testimony did not reach the question of possession; therefore admission of the testimony was unnecessary.

Were we faced with somewhat different facts perhaps the result on this issue would be different. There is a difference, however, between a first offender, who has never been before a disciplinary committee and a person, such as Segarra, who makes the statement that he never gives out the names of his witnesses. If the court were to condone his behavior we would open the door to allowing inmates like Segarra to manipulate the disciplinary procedure. Such an inmate could always refuse to do anything to assist the investigating officer in preparing the statements for the hearing and then always demand to call witnesses, relevant or not, during the hearing. It was the plaintiff's practice not to cooperate with the investigating officer. Once given that opportunity, we cannot approve a rule that would allow him to disrupt and impede the disciplinary proceedings. Segarra received the due process protections mandated by *Wolff* and cannot now profit by his own manipulative behavior.

### IV

■ The last ground for reversing the district court is that the prison officials are entitled to immunity from damages liability. The case relied upon by the court to establish liability has since been reversed. At the time the court below made its decision, *Ward v. Johnson,* 667 F.2d 1126 (4th Cir.1981), *rev'd.,* 690 F.2d 1098 (4th Cir. 1982), stood for the proposition that a prisoner faced with a loss of good time credit had a constitutional right to call a witness as long as it would not interfere with the

---

**9.** In addressing the issue of when a prisoner may call witnesses and when the prison officials may refuse to call a witness the Court stated as follows:

> Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. Any less flexible rule appears untenable as a constitutional matter, at least on the record made in this case. The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments.

418 U.S. at 566–67, 94 S.Ct. at 2979–80.

prison's safety or correctional goals.[10] 667 F.2d at 1130. If this right were violated, according to the panel decision, the prisoner should at least be granted nominal damages. Subsequent to Segarra's trial, however, *Ward* was reversed by this court sitting *en banc.*

*Ward v. Johnson* discussed both qualified and absolute immunity in reaching the conclusion that members of disciplinary committees were absolutely immune. Applying *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the court concluded that absolute immunity attaches and extends to certain members of the executive branch when their role in administrative adjudicatory proceedings is functionally comparable to that of a judge. For this immunity to arise the proceeding must possess "many of the same safeguards ... available in the judicial process." 690 F.2d at 1105. Qualified immunity from liability for civil damages will arise unless the official's conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." 690 F.2d at 1111. (Quoting *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

We feel it is obvious that the defendants are entitled to qualified immunity from damages. The procedural history of *Ward,* the case upon which liability was grounded, dictates this conclusion. The disposition of *Ward* emphasizes the fact that the question of when a witness must be called and when a hearing officer may refuse to hear live testimony on behalf of an inmate had not been clearly settled so that a reasonable person would have clearly known what the constitutional right of the prisoner was at the time of the hearing. Moreover, *Pollard v. Baskerville,* 481 F.Supp. 1157, 1161 (E.D. Va.1979), *aff'd,* 620 F.2d 294 (4th Cir.1980) (table) stands for the proposition that the hearing officer has the discretion to exclude live witnesses from the hearing. Therefore, we conclude that the defendants were entitled to qualified immunity from civil damages.

The question of whether to apply absolute immunity in the present case is a more difficult one to reach. *Ward v. Johnson* and *Butz v. Economou* have set forth a seven element test to determine if sufficient procedural safeguards exist to ensure a fair and impartial hearing in an administrative adjudicatory proceeding wherein the hearing officer is functionally equivalent to a judge.[11] 690 F.2d 1105–06. After examining the record and the regulations of the North Carolina Division of Prisons, we conclude that the procedural safeguards are present here and that the officials are entitled to absolute immunity.

McDade's posture is like that of the defendant in *Ward* who was chairman of the disciplinary committee that functioned in a judicial capacity. He was required to make

---

**10.** Here the prisoner has the right to call witnesses and the unit supervisor has the duty to have witnesses needed available at the hearing when it was necessary. Otherwise, written statements may be used, particularly where more than one witness is to testify to a specific fact in question. The chairman also has the authority to postpone the hearing until a witness can be present. Inmate Conduct Rules, Discipline, 5 NCAC 2B, .0203(b)(3), (6).

**11.** Those seven elements listed in 690 F.2d at 1105–06 are as follows:

(1) the administrative proceedings should be "adversary in nature;" (2) the officer exercising the adjudicatory power in the administrative proceeding should not be subject to supervision or direction of other employees engaged in investigative or prosecutorial duties; (3) a party should be entitled to offer either oral or written relevant and non-repetitive evidence on his behalf; (4) the record of the proceedings should be duly recorded and, so recorded, should constitute the exclusive record for decision; (5) the proceedings should be so structured as to assure the exercise by the officer in his decision of independent judgment on the evidence before him; (6) the proceeding should be such as to prevent the danger of retaliatory response by the disappointed inmate to an adverse decision; and (7) there should be reasonable opportunity for the party involved to challenge by appeal the decision. So long as those exercising administrative adjudicatory powers are subject generally to these restraints, with their reasonable tendency to reduce the need for a judicial remedy to deter unconstitutional conduct, they "are entitled to absolute immunity from damages liability for their judicial acts."

the evidentiary ruling concerning the propriety and necessity of admitting the letter and the witness's testimony. This is functionally comparable to a judge's action in a judicial proceeding. 690 F.2d 1106. We next examine the proceedings in the context of the seven safeguards that guarantee a fair and impartial proceeding.

The proceedings were adversarial in nature. The prisoner is entitled to have a member of the staff represent him before the committee; if necessary to permit a fair decision he may confront and cross-examine his accuser; and, he has the right to refute or explain evidence against him as well as to present evidence and statements in his own behalf. 5 NCAC 2B.0203(b)(4), (6).

The members of the committee are insulated from improper supervision to assure their independent decision. The regulations require a balanced and impartial tribunal and no one initiating charges, who is a witness in the case, or who is on the staff of the unit where the accused is assigned may be a member of the committee hearing the case. 5 NCAC 2B.0203(b)(1).

The committee is required to keep a record of the proceedings. This record is to be fully developed to enable the committee to reach a proper decision on the record. The chairman has the discretion to postpone the hearing to allow a necessary witness to testify or to obtain additional information. Further, he may reopen the hearing for additional questioning if the committee feels more information is necessary to ensure a proper decision. The record must contain the committee's findings and rationale for the findings. 5 NCAC 2B.0203(b)(6), (7), (8). Once the decision is recorded the inmate may have his objections recorded in the record. The committee's decision is then reviewed for procedural errors and to ensure that the inmate received a full and fair hearing. The inmate is informed of the result of the review and may then appeal on the full record to the Director of the Prisons or his designee. 5 NCAC 2B.0204. This procedure provides the inmate with an automatic review of the case with his objections on record followed by an appeal on the record. Segarra was provided with both a review and an appeal on the record of the proceedings.

The last element to be examined here, the danger of retaliatory response, is proved by the very existence of the present suit. As Judge Russell recognized in *Ward,* "[t]he proclivities of prison inmates to engage in litigation are prodigious. It has been estimated that between 30 and 40 percent of our appeals in this Circuit concern proceedings by prison inmates." 690 F.2d at 1108. This very suit became a retaliatory action to an unfavorable evidentiary ruling.

Because the seven elements necessary to ensure that procedural safeguards similar to a judicial proceeding are present here, and because the role of the prison officials is functionally comparable to a judge, we hold that the defendants are absolutely immune under *Ward v. Johnson.* To hold otherwise would be to open the doors of the courthouse to suits that would not only be burdensome, harassing and time-consuming for prison officials who serve on disciplinary committees, but would expose them to a financial risk that could result in their refusing to sit on such committees. This could seriously hamper the proper administration of our prisons.

## V

As a result of our conclusion that monetary damages were not requested by the plaintiff, that Segarra received all the process due him under *Wolff v. McDonnell* and that the defendants are absolutely immune from any damages award, the judgment of the district court is

REVERSED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

The majority opinion makes very much of plaintiff Segarra's developed reluctance to provide in advance the names of witnesses he wished to call, frustrating employment by the prison officials of the procedure at North Carolina Central Prison of obtaining preliminary written statements from those

witnesses. Segarra's refusal to provide the name of Julio Herencia prior to the disciplinary hearing is brandished as "manipulative behavior" from which Segarra should not be permitted to profit. *Ante,* at 1305.

I believe the majority has pointed the finger of blame at the wrong person. The truly "manipulative behavior" which we should condemn is the conduct of the defendant, McDade. The majority opinion accords no treatment whatsoever to McDade's proven reluctance to permit an inmate to call witnesses on his behalf and thus present live testimony pertinent to his case. Yet the rules promulgated by the state department of corrections clearly contemplated that such testimony is permissible. 5 N.C.Admin. Code 2B, .0203(b)(6).

Undisputed here is the fact that McDade has conducted some 15 to 20 disciplinary hearings per week over a three and one-half year period. Throughout that period, inmate requests for live testimony from fellow prisoners have numbered one or two per week (182 to 364 in total). Yet, as the magistrate found, live witnesses for the prisoner were heard only two or three times during the entire three and one-half year period. McDade has prohibited the presentation of live testimony in no less than 98.3 percent of the cases in which an inmate has sought to call a live witness. In short, McDade has made it a personal rule virtually to prohibit a prisoner from calling a witness to testify on his behalf.

The Constitution prohibits a prison disciplinary official from so undermining the fairness, impartiality, and evenhandedness of the due process to which a prisoner is entitled. And the unconstitutionality of the course pursued by McDade is no less so merely because McDade is accorded discretion to make reasonable judgments on a case-by-case basis as to the relevancy of testimony sought to be presented and as to the effect the calling of a particular witness might have upon legitimate institutional concerns. Discretion is meant to be exercised with respect to a given case and its facts. Discretion is abused when it is blithely cited to justify what is, in fact, a generally applicable, arbitrary decision.

## I

Before examining where, in my opinion, the majority errs, I should state my agreement with that portion of the majority opinion which reverses the award of nominal damages.

A plaintiff in a § 1983 action no doubt is entitled to an award of nominal damages if he or she prevails and if the complaint seeks monetary damages. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).[1] Segarra, however, never sought damages. In a day and age when *pro se* complaints in civil rights actions are accorded liberal treatment, one might think Segarra's failure to specifically seek money damages is a matter of no great moment. *Cf. Gordon v. Leeke,* 574 F.2d 1147 (4th Cir.1978), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978) (court's duty is to interpret *pro se* complaints liberally).[2] The right to a trial by jury, however, is indeed a matter of supreme moment, as the 7th Amendment makes perfectly clear. Accordingly, we have held that a § 1983 action for damages is a civil action subject to the 7th Amendment and its jury trial provision. *Burt v. Abel,* 585 F.2d 613, 616 (4th Cir.1978). *See also Amburgey v. Cassady,* 507 F.2d 728 (6th Cir.1974). The § 1983 defendant facing a potential liability in damages also is entitled to assert whatever immunity defense, either qualified or absolute, that he or she might be able to estab-

1. Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, ... we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) (footnote and citations omitted).

2. Segarra drafted his own complaint, but he was granted court-appointed counsel before trial.

lish. *Briscoe v. LaHue,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (absolute immunity); *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity).

To exercise the right to a jury trial or to assert an immunity defense that might be available, the defendant must have notice that damages are being sought. The defendants here had no such notice. Rather, nominal damages were awarded by the magistrate *sua sponte* at the close of the case. The magistrate simply could not award those damages, given the course the case had taken.

## II

Where the majority and I part company is on the meaning of due process.

## A

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court sketched the basic contours of a prisoner's due process rights in a disciplinary hearing:

> [T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.... Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases.

*Id.* at 566, 94 S.Ct. at 2979. As the whole fabric of the *Wolff* opinion reveals, the due process clause calls for a prison disciplinary proceeding as fair, impartial, and evenhanded as the circumstances will allow.

The right to call witnesses in one's defense is a cornerstone of due process, and is basic to the fairness of a hearing. *E.g., Bartholomew v. Watson,* 665 F.2d 915, 918 (9th Cir.1982). The right, of course, is not an absolute one in the context of prison disciplinary hearings. *Baxter v. Palmigiano,* 425 U.S. 308, 321, 96 S.Ct. 1551, 1559,

47 L.Ed.2d 810 (1976); *Wolff, supra,* at 566, 94 S.Ct. at 2979. The state has legitimate interests that should be accommodated in determining what process is due in any given situation. The special circumstances of a prison—among them, the special concerns of institutional security and of correction and rehabilitation—can circumscribe an inmate's right, in a particular case, to call a witness in his behalf. *Wolff, supra,* at 566, 94 S.Ct. at 2979; *Zaczek v. Hutto,* 642 F.2d 74, 76–77 (4th Cir.1981).

The essence of the inmate's qualified right to call witnesses, however, is that the decision to preclude the calling of witnesses should be made on a case-by-case analysis of the potential hazards which may flow from the calling of a particular person. *See Bartholomew, supra,* at 918. *See also Hayes v. Thompson,* 637 F.2d 483, 487–89 (7th Cir.1980). A *per se,* generalized proscription against the calling of a certain category of witnesses—without regard to the existence of any legitimate state interest that should be protected in the particular case—is unconstitutional. *Bartholomew, supra.*

Indeed, a prison disciplinary officer has the discretion to make such determinations on a case-by-case basis and, under our decision in *Ward v. Johnson,* 690 F.2d 1098 (4th Cir.1982), is shielded from liability when acting within his or her ambit, providing, of course, that no procedural infirmities inhere in the system in which the officer operates. A case-by-case assessment is not too much to ask from the officer whose constitutional obligation, above all, is to ensure that an inmate receives a fair, impartial, and evenhanded hearing. The discretion accorded to a disciplinary official to exclude evidence that is irrelevant or unnecessary, *Zaczek, supra; Ward, supra,* is a discretion meant to be exercised with respect to the facts of a particular case. So, too, is the discretion to exclude live testimony in the interests of prison security or correction and rehabilitation necessities. And the discretion to make case-by-case determinations is accorded so that it might be exercised, not so that it might be used to cloak arbitrary, and

preordained, decisions extending to essentially all cases.

## B

When one takes those considerations into account, the unconstitutionality of what has taken place in North Carolina Central Prison is revealed. The facts admit of only one conclusion, the one reached by the magistrate below: Segarra was prohibited from calling his fellow inmate to testify not by virtue of a principled exercise of discretion on the part of the defendant McDade but, rather, by the application of an arbitrary policy of prohibiting live testimony. Simply put, McDade, for reasons his own, just does not permit live testimony.

To be sure, McDade cited discretionary reasons when he denied Segarra's request to call Herencia. McDade rejected Segarra's proffer of the witness on relevancy grounds. That position, however, must be recognized for what it is: a sham. No reasonable, open, and impartial mind could believe that Herencia's testimony was irrelevant to the question before the disciplinary committee. Herencia was prepared to admit to his own possession of the drugs and was prepared to establish that it was he, and not Segarra, who threw the napkin with the pills enclosed to the ground. His testimony would have amounted to a complete exoneration of Segarra.[3]

Nor can McDade's reading of the handwritten note from Herencia to Segarra sent prior to the disciplinary hearing—the note which McDade construed as going to Herencia's "ownership," but not "possession," of the drugs—be accepted as the discretionary action of an impartial hearing officer doing his best to rule on the relevance of proferred testimony. That note[4] relates to an entire event and must be read with that event in mind. Segarra was charged with possession of drugs found in or near a garbage can. The question that had to be resolved was who put the drugs where they were found. A prison officer testified that he saw Segarra throw the pills to the ground. Herencia's note, by any reasonable reading, points to what the testimony of Herencia and Segarra would unequivocally tend to prove: Herencia, and not Segarra, put the drugs there; Herencia, and not Segarra, was the person to be charged with possession. Herencia's testimony, then, was so plainly relevant that the conclusion is inescapable that McDade's decision to the contrary could only have issued from a mind already made up.

I also find myself reluctantly in disagreement with the majority's holding that the officer's discretion to prohibit live testimony in the interests of prison security or undue disruption justified the course taken below. The magistrate found as a fact that calling Herencia to the hearing would have required but a short delay, during which time other disciplinary cases waiting to be heard could have proceeded, and that no

---

**3.** The full nature of the testimony Herencia would have provided is made clear in a statement obtained from Herencia after the disciplinary hearing, but admitted into the record for purposes of administrative appeal. The statement is worthy of quotation:

> I then went into my pocket and pulled out a napkin which had ten (10) white pills, and immediately threw it on the ground by the garbage can. I then proceeded to walk away from the fence, 'cause I knew Officer Walker was looking at me and was about to shake me down. Instead, the officer went straight to the garbage can and picked-up the napkin I had thrown on the ground. . . .
>
> As much as I hate to receive a write-up, I can't stand aside and let an innocent man take a fall for me. I admit to having the ten (10) pills in my pocket, and admit to throwing them on the ground the moment I saw Officer Walker approach me.

**4.** The handwritten note to Segarra, the note which supposedly points only to Herencia's "ownership" of the pills, reads in part:

> Hey Bro,
>
> Sorry about that weak shit that jumped off this morning. I didn't expect anything big to come off from it, but I guess I was wrong. Listen, I'm going to write a note to Capt. Steward about the truth. Maybe when he learns it was my dope and not yours, he might help you get off that lock up and give you your job back. That's pretty solid of you to keep your mouth shut, but in this case, I promise I won't let you take the rap for me. . . .
>
> Later Bro,
> J.J.

threats to the prison's security were raised by calling Herencia. Indeed, McDade himself made no mention of security concerns or potential disruption when he chose to refuse to permit Herencia's testimony.

All that remains, then, is the claim that there is an inherent disruptive effect in allowing prisoners like Segarra to call live witnesses although they refuse to provide those names in advance, thus making it more difficult for the prison authorities to solicit written statements instead. That position, once it is boiled down to its essence, is nothing but a veiled argument that prison officials can prohibit live testimony altogether and limit a prisoner to written statements in his defense.[5] Were that the law, the Supreme Court would have had no occasion to say, as it did in *Wolff*, that "the inmate facing disciplinary proceedings should be allowed to call witnesses *and* present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979 (emphasis supplied). There would be no "right" to call witnesses. There would be no need to "qualify" the right to call witnesses. There would be no witnesses at all.

### III

The unconstitutionality of the process afforded Segarra established, it follows that, from my viewpoint at least, Segarra was entitled to the declaration of his rights sought in his complaint and granted by the magistrate, without regard to any immunity from damages that the defendant McDade might enjoy. *Wallace v. King,* 626 F.2d 1157 (4th Cir.1980), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981); *Pope v. Chew,* 521 F.2d 400 (4th Cir.1975).

Having prevailed in his civil rights action, Segarra should also be entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988. While the majority opinion is not

specifically clear on the matter, the intimation therein is that, because an award of attorney's fees necessitates the paying of some money by a defendant, an immunity defense—whether qualified or absolute—is properly asserted against the award. *Ante,* at 1303–1304. The law is to the contrary. The immunity defense does not bar a fee award where the plaintiff has prevailed in an action for declaratory or injunctive relief. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 738–39, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980); *Ward v. Johnson,* 690 F.2d 1098, 1116 n. 1 (4th Cir.1982) (*en banc*) (Winter, C.J., dissenting).

The magistrate awarded Segarra attorney's fees under § 1988, and in doing so followed to the letter the considerations we set forth in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir.1978). That seemingly unassailable award, though, even were this dissenting opinion to prevail, would have to be reversed and the issue remanded to the lower court for further consideration. As far as the record reveals, the defendant received neither notice nor an opportunity to be heard on the amount of fees to be awarded. Plaintiff's affidavits, which were adopted by the magistrate as the basis of the award, were not served upon the defendant. Consequently, the defendant was unable to challenge the facts integral to the fee award.

The defendant is not entitled, in the absolute sense of that word, to a full-fledged hearing on the specific dollar amount to be awarded. *See Thomason v. Schweiker,* 692 F.2d 333 (4th Cir.1982). Due process does not require an evidentiary hearing in each and every instance that an award of attorney's fees is to be made. Implicit in the rule of law that makes an evidentiary hearing less than mandatorily required, however, is the assumption that the defendant will be able to challenge the representations of a plaintiff, whether through opposing affidavits or briefs and memoranda. That opportunity, at the very least, must be afforded to the defendant.

---

**5.** Once the written statements are taken in evidence, live testimony presumably would be excluded as merely cumulative.

## IV

I would reverse the magistrate's award of nominal damages, and thus concur in the judgment to that extent. Perceiving a plain departure from constitutional imperatives and, indeed, a systematic deprivation of a prisoner's due process rights occasioned by the defendant's *de facto* proscription against live witnesses in defense of a prisoner, I would affirm that portion of the decision below declaring the process afforded Segarra undue and hence unconstitutional and would remand the case for further proceedings relating to an award of attorney's fees to which Segarra is entitled. In those respects, I dissent.