David SAXNER and Alfred Cain, Jr., Plaintiffs-Appellees, Cross-Appellants,

v.

Charles BENSON, et al., Defendants-Appellants, Cross-Appellees.

Nos. 82–1799, 82–1816.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1983.

Decided Feb. 13, 1984.

Rehearing and Rehearing En Banc Denied June 8, 1984.

Gloria C. Phares, Washington, D.C., for defendants-appellants, cross-appellees.

G. Flint Taylor, Hass, Hoffman, Schmiedel & Taylor, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Before WOOD and CUDAHY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.[1]

■ Originally the most important issue in this case was whether the members of the prison Institutional Disciplinary Committee were entitled to absolute immunity, not merely qualified immunity, from suits alleging the deprivation of a prisoner's constitutional rights. In the meantime, however, this court in *Redding v. Fairman,* 717 F.2d 1105, 1117 (7th Cir.1983), has resolved the immunity issue by adhering to *Chavis v. Rowe,* 643 F.2d 1281, 1288 (7th Cir.), *cert. denied,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981), and *Mary and Crystal v. Ramsden,* 635 F.2d 590 (7th Cir.1980), in finding no basis or justification for absolute immunity.[2]

The only remaining issues are whether or not the compensatory damages awarded by the jury and approved by the trial court are excessive, and whether the trial court erred in denying plaintiff's request for attorneys' fees under the Equal Access to Justice Act (28 U.S.C. § 2412).

I.

The defendants are senior correctional officers at the federal correctional institution at Terre Haute, Indiana. The plaintiffs, David Saxner and Alfred Cain, Jr., are former inmates of the institution. In 1975, the Terre Haute prison had a staff of 350 people; it housed nearly 2,000 inmates in its main facility and approximately 300 in its farm camp. In January, 1975 a prisoner died in the prison hospital under circumstances which were not entirely clear; shortly thereafter the prisoners engaged in a two day work stoppage to protest the inmate's death. The plaintiffs apparently did not participate in the work stoppage. Instead, they endeavored to discover the circumstances surrounding the prisoner's death and to report their findings to interested members of the press and public. Their efforts were partly responsible for an investigation of the prison's hospital and the resignation of the prison's physician.

---

* The Honorable Anthony J. Celebrezze, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. The author acknowledges the substantial assistance of Judge Celebrezze to this opinion by contributing Section I.

2. This panel, nevertheless, recognizes and respects the thoughtful contrary analysis advanced by Judge Celebrezze who dissents from the resolution of this issue. His arguments suggest that in due time the issue may merit reconsideration in this circuit. District Judge Dillon, the original district judge to consider this case, also agreed with the view that defendants were entitled to absolute immunity, but reconsidered and changed his holding following *Mary and Crystal v. Ramsden,* 635 F.2d 590.

On February 14, 1975, the plaintiffs were each charged with encouraging others to engage in another work stoppage, and they were confined to a section of the hospital being used as an administrative segregation unit. Saxner was notified of his right to a hearing, to be represented by a staff member of his choice, and to present testimony and documentary evidence; the record does not indicate that Cain ever received a copy of a similar notice.

The plaintiffs, who had remained in segregation, appeared before the Institutional Disciplinary Committee (IDC) on February 21, 1975. On that day, the IDC was composed of Theodore Cleavinger, an associate warden, Marvin Marcadis, a correctional supervisor, and Tom Lockett, chief of case management.[3]

At the hearing before the IDC, Saxner was represented by a staff counselor of his choice. After reading the charge against Saxner, the incident report was introduced, as well as three documents written by Saxner; no guards or inmates were called to testify,[4] but Saxner was permitted to introduce affidavits of several inmates, and to testify on his own behalf. At the close of evidence, the IDC found Saxner guilty of encouraging a work stoppage. The IDC also found Saxner guilty of two other offenses with which he had not been charged: possession of contraband and unauthorized use of the mail.[5] The IDC ordered that Saxner be confined in administrative segregation for an indefinite period, and that he forfeit 84 days of good time; it also recommended that he be transferred to another institution.

Cain's hearing was held on the same day, before the same three correctional officers. Cain denied that he had encouraged others not to work and demanded an opportunity to examine his accuser. The IDC produced an incident report, which contained the particulars of the work stoppage charge, and two other documents which had been seized in an administrative search of his cell; no other evidence was produced. Cain was found guilty of the original work stoppage charge and of an additional charge of possession of contraband (the materials which had been seized in the search of his cell). The IDC ordered that Cain be confined in administrative segregation indefinitely, and that he forfeit 96 days of good time; the IDC also recommended that Cain be transferred to another institution.

Each plaintiff was informed of his right to appeal the IDC's decision, and both plaintiffs appealed the IDC's decision to the warden of the prison. The warden granted part of the relief sought by the plaintiffs on appeal: he restored the forfeited good time and ordered the plaintiffs' release from administrative segregation; the warden refused, however, to expunge their records. Both plaintiffs appealed to the Regional Office of the Bureau of Prisons; based upon the Regional Office's recommendation, the records of both Cain and Saxner were expunged.

This action was commenced in March, 1975, while the plaintiffs were still in administrative segregation. The initial complaint was filed *pro se*. Subsequently, counsel was retained and the complaint was

---

**3.** Generally, IDCs at Terre Haute were composed of three members. At least two of these members necessarily were senior correctional officers with a rank of department head level or higher. The third member was normally a less senior member of the correctional staff. Staff members who witnessed the incident were excluded from membership in the IDC, unless the incident was so widely witnessed that every staff member witnessed it. Also named in the complaint were Charles Benson, warden, and C.D. Wilson, administrative supervisor, who by reason of a directed verdict and a favorable jury verdict are no longer in the case.

**4.** Saxner attempted to produce several inmates to testify; this testimony was excluded because it was considered cumulative.

**5.** The basis for these charges, and the additional charges against Cain, were certain documents seized in the course of administrative searches of their cells. In Saxner's cell, a "press release" was found detailing the problems with the prison hospital; the document had been sent to fifty newspapers. Other documents of a similar nature were also seized. In Cain's cell, a letter detailing the need for a prison labor union was found.

amended several times; the third amended complaint sought declaratory, injunctive, and monetary relief for alleged deprivations of the plaintiffs' first, fourth, fifth, sixth, and eighth amendment rights resulting from the hearings before the IDC in February, 1975.

Prior to trial, the defendants moved for judgment on the pleadings, asserting that they were entitled to absolute immunity from liability for actions taken in their capacity as IDC members. Although the district court granted the motion, it held, on reconsideration, that the defendants were entitled only to qualified immunity in light of this court's decision in *Mary and Crystal v. Ramsden,* 635 F.2d 590. The case was tried to a jury in April, 1981; the jury found, in response to special interrogatories, that all three of the IDC members had violated the plaintiffs' fifth amendment right to due process. The jury awarded each plaintiff $4,500 as compensatory damages.[6] In May, 1981 the defendants moved for judgment notwithstanding the verdict, arguing that the verdict was excessive; the motion was denied. The plaintiffs moved for an award of attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2413; this motion was also denied. The defendants appeal, arguing that the IDC members are entitled to absolute immunity, an issue we have already addressed, and that the jury's verdict was excessive. The plaintiffs have cross-appealed, arguing that they are entitled to an award of attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2413.

## II.

▪ The jury award of compensable damages in the amount of $4,500 to each plaintiff was found by the trial court, in ruling on defendants' motion for judgment notwithstanding the verdict, to be supported by sufficient evidence. The defendants find no fault with the jury instructions based on *Carey v. Piphus,* 435 U.S. 247,

262–64, 98 S.Ct. 1042, 1051–1052, 55 L.Ed.2d 252 (1978), claiming only that the amount was excessive.

Cain spent 35 days in segregation where he was confined almost 24 hours a day without access to the prison yard or other exercise facilities. He also lost various other privileges. Cain could not, while in segregation, earn good time, and his possible parole was affected. Saxner spent his first week in a windowless segregation cell in extremely unsanitary and repulsive conditions. He was not allowed out of that cell. For a few days he had no bedding, soap or adequate lighting. Later he was transferred to a different unit for two weeks.

The trial court credited plaintiffs' testimony to establish mental and emotional distress injuries attributable to the due process violations. The trial court found that the "anguish and frustration which flowed from the patent unfairness of the hearings and the fear that such unfair treatment would continue in the future in their administrative review and appeals, at their parole hearings, and in their day to day existence in the segregation units unrelated to the issue of the length (35 days) of time served in segregation" contributed to their actual injuries. The trial judge noted that nominal damages are all that are due upon a showing of a denial of due process without proof of actual damage, as injury cannot be presumed from denial of due process. *Carey v. Piphus,* 435 U.S. at 258, 98 S.Ct. at 1049. However, being convinced that plaintiffs had established "the link between the due process violations and the actual injury consequences," the trial judge allowed the awards to stand.

The awards may be somewhat excessive, but so are the defendants' arguments which characterize plaintiffs' damages as "little more than a litany of diminished creature comforts combined with generalized claims of anxiety." In view of the general restrictions on appellate review of a jury's award of monetary damages, we will not substi-

---

**6.** Each plaintiff was awarded $1,500 from each defendant; thus, each defendant was exposed

to liability for $3,000 of the full damage award.

tute our judgment in these circumstances for that of the judge and jury who heard the testimony. Our own review of the evidence briefly summarized above satisfies us that "the trial judge did not abuse his discretion in finding 'nothing untoward, inordinate, unreasonable or outrageous—nothing indicative of a runaway jury or one that lost its head.'" *Gruenthal v. Long Island Railroad Co.*, 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968).

### III.

■ Plaintiffs, as prevailing parties, claim they are entitled to an allowance of attorneys' fees under alternative theories.

During the time this suit was still pending in the district court on post-trial matters, the Equal Access to Justice Act, 28 U.S.C. § 2412, became effective on October 1, 1981. Although the Act broadened the liability of the government for attorneys' fees and expenses, it contained certain prerequisites. Sections 2412(b) and (d) limit this broadened attorneys' fees relief to actions "brought by or against the United States or any agency and any official of the United States acting in his or her official capacity." The trial judge disallowed the attorneys' fees because the United States was not named as a party defendant, nor were the defendants named as officials of the United States acting in their official capacities, although in fact they may have been so acting.

We agree with the district court. Plaintiffs do not satisfy the statutory requisites for attorneys' fees under the Act. The United States was not named, and the defendants were named only individually. In addition to the absence of any allegation that the defendants were acting in their official capacities, it is specifically alleged in paragraph 10 of the Third Amended Complaint, upon which the case was tried, that "All defendants are sued in their individual capacities." Plaintiffs would now have us remodel their complaint or give its allegations some subtle interpretation in variance with its plain language so as to qualify under the fees statute. The timing of this lawsuit and the enactment of the Equal Access to Justice Act may be unfortunate, but we cannot change those circumstances.

Plaintiffs alternatively claim to be entitled to an award of attorneys' fees under section 2412(b) of the Act, although plaintiffs concede that section also requires that the action meet the "official capacity" requirement. Plaintiffs urge that we read section 2412(b), permitting an award of attorneys' fees against the federal government to the same extent that fees may be awarded in cases involving "any other party," as opening the way for attorneys' fees through the Civil Rights Attorneys Fees Award Act, 42 U.S.C. § 1988. That Act provides for an award of fees in actions enforcing certain provisions of the Civil Rights Act, including 42 U.S.C. § 1983. After that argument brings us to section 1983, we are then urged to overlook section 1983's "acting under color of state law" requirement. The plaintiffs' claims here, they argue, are virtually identical to the usual section 1983 action so that attorneys' fees should be allowed under color of federal as well as state law. That argument deserves credit for originality, but it is too original.[7]

Under the circumstances in this case we cannot send the government a judicial bill for plaintiffs' attorneys' fees.

The parties shall bear their own costs.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I believe that *Redding v. Fairman*, 717 F.2d 1105 (7th Cir.1983), is entirely sound in its resolution of the issue of absolute immunity for a prison disciplinary committee. I

---

7. It appears that in the district court plaintiffs argued an entitlement to fees upon a bad faith contention. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Alyeska Pipeline Company v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The district court found the defendants' actions were not vexatious, wanton, or oppressive sufficient to require an award of attorneys' fees. Although that argument was not specifically advanced here, we would not disturb the trial judge's findings on the basis of this record.

must therefore, in view of the somewhat ambiguous tone of footnote 2 and in light of the dissent, respectfully indicate my support of *Redding* as an expression of the circuit position.[1]  Any effort to analogize a trio of correctional officers conducting disciplinary proceedings in a prison to a "judge" or even to an administrative law judge, *see Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), is unwarranted.

The activities and procedures of these prison officers are so dissimilar in form and substance from those of judges granted absolute immunity that reliance on an all-encompassing similarity of quasi-judicial function will not wash.  As Chief Judge Winter has pointed out, performance of "quasi-judicial" functions does not automatically trigger absolute immunity.  *Ward v. Johnson,* 690 F.2d 1098, 1115 (4th Cir.1982) (Winter, C.J., dissenting).  Thus, in *Wood v. Strickland,* 420 U.S. 308, 320–21, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975), school board members, who were sued for due process violations in disciplinary proceedings, were afforded only qualified immunity.[2]  *See Ward v. Johnson,* 690 F.2d at 1115–16 (Winter, C.J., dissenting).[3]  The prison disciplinary proceedings at issue here are certainly much more akin to the school board meeting in *Wood* than to a hearing conducted by

an ALJ under the Administrative Procedure Act.

In any event, a comparison of this case with *Butz* shows how extraordinarily short the case before us falls of the standards prescribed in *Butz.*  Among the characteristics of administrative law proceedings which the *Butz* court deemed significant were (1) the impartiality of the decision-making process and the reliability of the information developed; (2) the importance of precedent in resolving controversies; (3) the adversary nature of the proceedings; and (4) the availability of review.  *Butz* at 512–13, 98 S.Ct. at 2913–2914.

The *Butz* court relied on the Administrative Procedure Act and noted that "federal administrative law requires that agency adjudication contain many of the same safeguards as found in the judicial process. . . ."  *Id.* at 513, 98 S.Ct. at 2914.  These protections include notice, representation by a lawyer, a verbatim transcript of the proceedings, subpoena power, presentation of oral and documentary evidence, cross-examination of adverse witnesses under oath (limited only by considerations of relevancy and materiality), rebuttal evidence and prehearing discovery.  5 U.S.C. §§ 554–57.  The Act also provides for impo-

**1.**  I note that this circuit is not alone in its view that members of the Institutional Disciplinary Committee ("IDC") of a federal prison are not absolutely immune from damages for constitutional violations.  In *Sihaad v. O'Brien,* 645 F.2d 556 (6th Cir.1981), the court rejected the same claim pressed by the defendants in this case, holding that IDC members are not "in one of 'those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business.' "  *Id.* at 561 (quoting *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)).

**2.**  The dissent fails to recognize the importance of *Wood v. Strickland* to the proper resolution of this case.  The functions performed by the *Wood* defendants were every bit as "judicial" as those of the defendants here, yet they received only qualified immunity.  The dissent dismisses *Wood* (without actually naming it) by asserting that the IDC members cannot be compared to school board members.  The dissent in this respect apparently discards the functional approach to immunity which it ad-

vocates elsewhere and instead apparently relies on the title of the officials and the context within which they operate.  As is demonstrated below, quasi-judicial functions are performed by many executive officials, and only in the most extraordinary cases are they absolutely immune from damage liability.  Whether an official's function and position in the government is far enough removed from the school board members in *Wood* to justify absolute immunity under *Butz* may be the key question in the case.  I suspect that the Supreme Court went as far as it is willing to go with quasi-judicial immunity in *Butz* itself.

**3.**  The dissent's reliance on *Ward v. Johnson,* 690 F.2d 1098 (4th Cir.1982) is inappropriate since *Ward* was rejected in this circuit as not representing "the better view."  *Redding,* 717 F.2d at 1117.  In *Redding* this circuit endorsed the Sixth Circuit's view that federal disciplinary committee members have only qualified immunity from damage liability.  *Id.*

sition of the burden of proof, findings and conclusions presented by the parties and ruled on by the hearing officer and a host of other procedural safeguards. The hearing officer may not also be involved in prosecutorial or investigative duties or be supervised by an employer interested in the case, and is subject to recusal for personal bias. The dissent fails to recognize the importance of these procedural safeguards, which were specifically relied upon by the *Butz* court and are almost all absent from IDC proceedings.

The disciplinary policy of the Bureau of Prisons provides few of the safeguards of the APA. The committee members are prison guards and supervisory employees who are in daily contact with the prisoners upon whom they sit in judgment. The committee members are supervisors and fellow employees of the guards who bring the charges and are in an unequal adversarial relationship with the prisoners. They are the keepers judging the kept rather than impartial adjudicators trained in law and presumably free of bias and prejudice. In addition, the information presented to the committee is frequently hearsay, self-serving and unreliable. *See Bracy v. Herringa,* 466 F.2d 702 (7th Cir.1972). Of course, the decisions of the committee are not based on precedent since there is no recorded precedent. And review is restricted to agencies of the Bureau of Prisons. To suggest that the committee functions in any real respect like the administrative law judge in *Butz* is to depart from reality.

The suggestion that members of the prison disciplinary committees are entitled to absolute immunity also ignores a major premise of the entire immunity doctrine—that absolute immunity is the *rare exception* to the rule granting qualified immunity to public officials performing discretionary functions. *See Ward v. Johnson,* 690 F.2d 1098, 1114 (4th Cir.1982) (Winter, C.J., dissenting). *See also Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349

(1982) (most executive officials entitled only to qualified immunity); *accord Harlow v. Fitzgerald,* 457 U.S. 800, 814–15, 102 S.Ct. 2727, 2736–2737, 73 L.Ed.2d 396 (1982). Thus in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), school board members who were clearly performing quasi-judicial functions (a factor heavily relied upon by the dissent with respect to IDC members) were granted only qualified immunity from damage suits arising out of disciplinary meetings. This circuit, by rejecting the majority position in *Ward v. Johnson* as not representing the "better view" (*see Redding,* 717 F.2d at 1117), has clearly decided not to create another exception to the qualified immunity rule.

The dissent, by attempting to apply, perhaps mechanistically, the four factor *Butz* test, loses sight of the overriding concern the Supreme Court expressed in *Harlow* and *Butz,* that grants of absolute immunity are appropriate only when the defendant official establishes that *public policy* so requires.[4] *Harlow,* 457 U.S. at 808, 102 S.Ct. at 2734; *Butz,* 438 U.S. at 506, 98 S.Ct. at 2910–2911. We said, in evaluating parole board members' claims to absolute immunity, that it should not be granted "absent compelling reasons." *United States ex rel. Powell v. Irving,* 684 F.2d 494, 495 (7th Cir.1982). No such reasons exist, nor have any been argued, for granting absolute immunity to prison disciplinary committees.

The dissent does not even attempt to justify absolute immunity here on policy grounds. Instead, it relies on a quite inappropriate functional test and a loose (at best) comparison with the responsibilities of the administrative law judges in *Butz.* But *Harlow* made clear that if public policy does not require absolute immunity, an official's function becomes irrelevant. The dissent makes no effort to explain why public policy requires absolute immunity for adjudicatory disciplinary proceedings in *prisons* but not in *schools.* Certainly, education is as

---

4. The dissent, I believe, makes the error of presenting the question as implicating "the need to protect *officials* who perform judicial or quasi-judicial functions." *Infra* at 676–

677 (emphasis supplied). The Supreme Court has made it clear that absolute immunity is granted only to protect the *public interest* and not the interests of the officials involved.

vital to our society as punishment. In any event, if public policy does not require absolute immunity for the high ranking presidential aides in *Harlow,* it does not, by any stretch of the imagination, require absolute immunity for comparatively low ranking prison officials dispensing discipline.

It would be poor policy to extend absolute immunity to these defendants. The Supreme Court has recently charted a course which suggests a broadening of the protections of *qualified* immunity coupled with conferral of new grants of *absolute* immunity primarily upon defendants occupying a high place on the governmental ladder. Thus, in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court made it more difficult for plaintiffs to prevail over a defense of qualified immunity by eliminating any requirement that the defendant show subjective good faith. *Cf. Egger v. Phillips,* 710 F.2d 292, 323 (7th Cir.1983) (*en banc*) (Cudahy, J., concurring). This makes it more likely that defendants will prevail on summary judgment, *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2738, thus reducing the burden of, and the possible intimidation resulting from, litigation. And in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), by extending absolute immunity to the President because of his high office, the Court indicated that the position an official occupies in the federal system may be relevant to the determination of what sort of immunity applies.[5] At least, the governmental rank of the official is relevant to the determination whether public policy requires absolute immunity. Here, of course, we are dealing with comparatively low-level officials whose duties are only quite incidentally "judicial" in any sense. And they are accorded adequate protection against harassment by the enlarged safeguards of qualified immunity as announced in *Harlow.*

Additionally, I note that the Supreme Court, in analyzing the issue of absolute immunity, has relied primarily upon the purposes of the post-Civil War amendments and of the Civil Rights Statutes. Thus, *Briscoe v. LaHue,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), which confirmed the absolute immunity of police witnesses at trials, was based upon a searching analysis of the state common-law immunity immediately after the Civil War. Congress is presumed to have acted in the context of common law immunities. I doubt that such an inquiry into the purposes of the post-Civil War amendments and statutes, which the dissent does not attempt to undertake, could support absolute immunity for prison disciplinary committees since the 1871 Congress was greatly concerned about the proper functioning of the penal system.

I therefore concur fully in the majority opinion except for any possible implication of dissatisfaction with the refusal of this circuit to grant absolute immunity to prison institutional disciplinary committees.

CELEBREZZE, Senior Circuit Judge, dissenting.

The majority has failed to analyze the immunity issue presented by this case consistent with the Supreme Court's decision in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Respectfully, I dissent.

The Supreme Court in *Butz* established clearly that in some circumstances executive officials performing judicial or quasi-judicial functions are absolutely immune

---

**5.** The dissent notes, correctly, that the Supreme Court in *Nixon v. Fitzgerald* claimed reliance on the "special functions" doctrine. However, no mention is made in *Nixon* of presidential functions' necessitating absolute immunity. Instead, the Court relied on the President's "unique position in the constitutional scheme." *Id.,* 457 U.S. at 749, 102 S.Ct. at 2702.

The dissent also suggests that in evaluating whether public policy requires absolute immunity, we are to look only at the function performed by the official in question. One need look no further than *Wood v. Strickland, supra,* to conclude that the dissent is incorrect in insisting that public policy uniformly dictates ab-

from liability for any tortious acts.[1] *Butz v. Economou,* 438 U.S. at 508–17, 98 S.Ct. at 2911–2912, 2916 (administrative law judge absolutely immune). For an official to demonstrate that he is entitled to absolute immunity for his acts, he must show: that his decisions are functionally comparable[2] to the type of decisions made by a judge, that the controversies which the official resolves are sufficiently intense to spawn harassing or intimidating litigation, and that the adjudicatory process over which the official presides contains sufficient safe-

guards to lessen the "need for individual suits to correct constitutional error." *Id.* at 512, 98 S.Ct. at 2914. Although several courts have applied the *Butz* analysis in a similar context, *e.g. Reed v. Village of Shorewood,* 704 F.2d 943, 951–52 (7th Cir. 1983) (liquor control commissioner absolutely immune for quasi-judicial acts); *United States v. Irving,* 684 F.2d 494, 496–97 (7th Cir.1982) (parole board members absolutely immune for quasi-judicial acts); *Segarra v. McDade,* 706 F.2d 1301, 1305 (4th Cir.1983); *Ward v. Johnson,* 690 F.2d 1098 (4th Cir.

---

solute immunity for those who perform judicial or quasi-judicial functions.

1. Normally, a prison official is entitled to qualified immunity from liability for acts occurring in the course of his duties. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). *See Butz v. Economou,* 438 U.S. 478, 498, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The type of immunity to be accorded an official, however, is not a function of that official's position within the hierarchical structure of government. *Id.* at 511, 98 S.Ct. at 2913. Rather, the type of immunity to be accorded a particular official depends upon the duties the official was discharging at the time the allegedly tortious conduct occurred. *E.g., Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978) (type of immunity available to a judge depends upon the nature of the act); *Hampton v. City of Chicago,* 484 F.2d 602, 608 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (nature of prosecutor's immunity depends upon character of conduct). *See Apton v. Wilson,* 506 F.2d 83, 91–92 (D.C.Cir.1974) (prosecutor absolutely immune only when participating in judicial process); *Lopez v. Vanderwater,* 620 F.2d 1229, 1233 (7th Cir.), *cert. dismissed,* 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980) (judge absolutely immune if unconstitutional act is judicial in character).

2. The concurrence believes that the Supreme Court in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), granted the President of the United States absolute immunity "because of his high office." According to the concurrence, the "rank of the official" determines whether public policy requires absolute immunity; it reasons that "if public policy does not require absolute immunity for the *high ranking* presidential aides in *Harlow,* it does not, by any stretch of the imagination, require absolute immunity for comparatively low ranking prison officials dispensing discipline" (emphasis added). Clearly, the concurrence's assertions that this dissent relies improperly on an official's "title" and disregards the "func-

tional approach to immunity law" are unfounded.

Contrary to the concurrence's assertions, the Supreme Court has stated repeatedly that the type of immunity to be afforded executive officials *does not* depend upon the official's "high" position in the executive branch. *E.g., Harlow v. Fitzgerald,* 457 U.S. 800, 808–809, 102 S.Ct. 2727, 2733–2734, 73 L.Ed.2d 396 (1982); *Nixon v. Fitzgerald,* 457 U.S. 731, 744–47, 102 S.Ct. 2690, 2699–2700, 73 L.Ed.2d 349 (1982); *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978). Instead, the Supreme Court has held consistently that the type of immunity available to executive officials depends upon the functions performed by the particular official claiming immunity. *E.g., Harlow v. Fitzgerald,* 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); *Nixon v. Fitzgerald,* 457 U.S. 731, 751, 102 S.Ct. 2690, 2702, 73 L.Ed.2d 349 (1982); *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911–2912, 57 L.Ed.2d 895 (1978). Accordingly, the Supreme Court in *Nixon* did not grant the President of the United States absolute immunity "because of his high office." Instead, the Supreme Court reasoned that absolute immunity was necessary to permit the President to fulfill responsibilities important for the effective functioning of our government. Similarly, the Supreme Court in *Harlow* did not hold that "public policy does not require absolute immunity for ... high ranking presidential aides." Indeed, the Supreme Court expressly *reserved* the question whether the petitioners, on remand, could prove that their functions were so sensitive as to justify a grant of absolute immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 813, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). I believe that the Supreme Court's decisions in *Butz, Nixon* and *Harlow* confirm the continued vitality of the "special functions" doctrine. Consistent with the Supreme Court's approach to immunity law, the critical inquiry does not depend upon the fact that this case involves "comparatively low-level officials", but rather, upon the functions which these officials were

1982) (en banc) (prison officials absolutely immune for quasi-judicial acts), one may not generalize safely from the holdings in those cases; every case differs in the degree which the official asserting absolute immunity is comparable to a judge, in the degree to which he is exposed to harassing litigation, and in the degree which the procedural formality of the proceeding is sufficient to assure that constitutional error, if it occurs, will not go uncorrected. Accordingly, each factor must be analyzed in the context of the facts and circumstances existing at the time the plaintiff's rights were infringed. Absent such analysis, a court cannot balance the need to protect the rights of citizens against the need to protect officials who perform judicial or quasi-judicial functions.[3]

I believe that this circuit has failed to analyze fully immunity issues concerning the special functions doctrine.[4] Without discussion, the majority holds that the federal correctional officers in this case are not entitled to absolute immunity; it believes that this court's decision in *Redding v. Fairman, et al.*, 717 F.2d 1105 (7th Cir.1983) is

dispositive. Without discussion, this court in *Redding* held that prison officials of the Illinois Department of Corrections were not entitled to absolute immunity; it believed that this court's decision in *Mary and Crystal v. Ramsden*, 635 F.2d 590 (7th Cir.1980) was dispositive. In *Mary and Crystal*, the primary issue was whether staff members at Goodland State Camp, a Wisconsin juvenile correctional institution, were entitled to absolute immunity. This court acknowledged that the threshold question was whether the staff members performed a function comparable to that of a judge; it concluded that the staff members of the juvenile center performed a function more akin to the function performed by school board members. *Id.* at 600. I do not believe that one can assert rationally that the function performed by the federal correctional officers in this case, who serve on a disciplinary committee in a federal penitentiary, is equivalent to the function performed by school board members.[5] The experience in this circuit demonstrates the need to analyze carefully each of the factors established by *Butz*.[6]

---

performing at the time that the alleged constitutional violation occurred.

3. According to the concurrence, this dissent focuses improperly on protecting *officials*, rather than the *public interest*. The concurrence reasons that public policy is the threshold question; "if public policy does not require immunity, *an official's function becomes irrelevant.*" (emphasis added).

As the concurrence recognizes, the critical question is whether public policy justifies conferring upon an official the right to absolute immunity. The concurrence fails to recognize, however, that we define the need for such protection by examining the *function* performed by the official. Quite logically, this approach has been called the "functional approach to immunity law." *E.g., Harlow v. Fitzgerald*, 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982). In other words, the importance of the function defines the public interest. In my view, the concurrence's suggestion that we first examine the public interest and if the interest is insufficient disregard the function performed by the official claiming immunity, is inconsistent with the basic rationale of the functional approach to immunity law. Whether the "functional test" established by the Supreme Court is an "inappropriate" approach to immunity law is not the issue. The issue in this

circuit concerns this court's willingness to follow Supreme Court precedent.

4. The exception is this court's decision in *United States v. Irving*, 684 F.2d 494 (7th Cir.1982). In *Irving*, the question presented was whether certain parole board members were entitled to absolute immunity. In an excellent discussion, this court found that the parole board members performed a task "functionally comparable" to judges, that the parole board members faced "the same risk of constant unfounded suits," and that the safeguards available protected adequately prisoners' parole rights. *Id.* at 496–97. Accordingly, this court held that these parole board members were entitled to absolute immunity. *Id.*

5. The difference between the function performed by prison officials and the function performed by school board members is as great as the difference between prisoners and schoolchildren. *See Ingraham v. Wright*, 430 U.S. 651, 669, 97 S.Ct. 1401, 1411, 51 L.Ed.2d 711 (1977) ("The prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration.")

6. For example, the question whether the available procedural safeguards are sufficient to assure that constitutional error will not go uncor-

In this case, the defendants are federal correctional officers who serve on a committee called the Institutional Disciplinary Committee (IDC).[7] Although, as prison officials they were primarily responsible for the day-to-day operations of the prison, they argue that they were discharging a quasi-judicial function while serving on the IDC, and, thus, that they ought to be entitled to absolute immunity for these acts in light of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). I agree.

Clearly, the appellants, as members of the IDC, are functionally comparable to judges. Indeed, IDC members are involved in the classic judicial function: they are required to determine whether an accused person is guilty or innocent of the charges brought against him. *See* Bureau of Prisons Policy Statement, 7400.5C (1974), Sec. 9(b). *See also* 28 C.F.R. Sec. 541.14(c). They are required to judge the credibility of witnesses, to weigh the evidence, and to make a principled determination of guilt or innocence. Because the IDC members discharge responsibilities which are identical to judges,[8] I believe that the first prong of the *Butz* test is satisfied. *See United States v. Irving,* 684 F.2d 494, 496–97 (7th Cir.1982) (parole board members are functionally comparable to judges). *Cf. Reed v. Village of Shorewood,* 704 F.2d 943, 951 (7th Cir.1983) (liquor control commissioner entitled to absolute immunity because acting in "judicial capacity").

The likelihood that an adverse decision would result in harassing or intimidating litigation is equally apparent. *Ward v. Johnson,* 690 F.2d 1098, 1108 (4th Cir.1982) (en banc). *See United States v. Irving,* 684 F.2d at 497 (danger that parole board members will be harassed by retaliatory suits). The ability of prisoners to generate litigation is substantial and well documented. *See Ward v. Johnson,* 690 F.2d at 1108. The burden of such prodigious litigation upon IDC members would be substantial in terms of time and money; these burdens are likely to affect the fashion in which IDC members discharge their quasi-judicial functions.

In my opinion, the final factor in *Butz,* whether the procedural safeguards are sufficiently formal to assure that constitutional error will not go uncorrected, is the crux of this dispute. *See Butz v. Economou,* 438 U.S. at 512, 98 S.Ct. at 2913–2914; *Reed v. Village of Shorewood,* 704 F.2d at 952. This factor is an expression of the inverse relationship between procedural regularity and the incremental deterrent effect of qualified immunity; if the formality of the procedure is sufficient to assure that constitutional error will be corrected, then qualified immunity will have only a marginal deterrent effect which, in turn, will not warrant exposing persons acting in a quasi-judicial function to the risk of personal liability and the expense of defending against the complaint of a disappointed liti-

---

rected depends on the particular procedures available. The procedural safeguards available to inmates who appear before the members of the IDC are not the same set of procedures available to juvenile inmates at a Wisconsin Juvenile Correctional Institution. *Mary and Crystal v. Ramsden,* 635 F.2d 590, 594 n. 1 (7th Cir.1980) (juvenile defendants were not permitted to have advocates at the hearing, were not permitted to question witnesses, and were not permitted to produce witnesses in their defense).

7. This circuit has twice concluded that prison officials involved in the disciplinary process were entitled to qualified immunity. *Chavis v. Rowe,* 643 F.2d 1281 (7th Cir.1981); *Hayes v. Thompson,* 637 F.2d 483 (7th Cir.1980). In both of these cases, however, the question whether prison officials are entitled to absolute

immunity does not appear to have been presented or decided; neither case cites or discusses the Supreme Court's decision in *Butz.*

8. The justification for affording absolute immunity to executive officials who perform quasi-judicial functions is patently obvious. Like parole board members and federal court judges, officials who serve on a disciplinary committee in a federal penitentiary perform the function of rendering "impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by their decisions." *United States v. Irving,* 684 F.2d 494, 497 (7th Cir.1982). ("The adjudicatory process simply could not work if the adjudicator had to anticipate a possible lawsuit from every dissatisfied litigant.").

gant. *See Simons v. Bellinger,* 643 F.2d 774, 782 (D.C.Cir.1980) ("The presence of these checks reduces the need for private causes of action and thereby renders absolute immunity appropriate."). Thus, absolute immunity is justified only when the procedures afforded the litigants are sufficient to assure that the risk of uncorrected constitutional error is low, and the attendant need for the incremental deterrent effect of qualified immunity is limited.

The procedures in effect at the time of the plaintiff's hearing before the IDC were fairly extensive.[9] Under Policy Statement 7400.5C, which was in effect in 1975, no staff member having personal knowledge of the incident which is the subject matter of a hearing is permitted to serve on the IDC. Policy Statement, 7400.5C, Sec. 9(a). *See* 28 C.F.R. Sec. 541.14(b). The IDC is required to keep a record of the proceedings which documents the inmate's awareness of his rights, the IDC's findings, its decision, the specific evidence relied upon by the IDC, and an explanation of the reasons for imposing the sanction chosen. Policy Statement 7400.5C, Sec. 9(c)(4). *See* 28 C.F.R. Sec. 541.15(g). Moreover, prisoners are entitled to seek review of the IDC's decision. Initial review of an IDC decision is provided by the warden; an adverse decision by the warden may be appealed to the Regional Director, Bureau of Prisons. Finally, decisions of the Regional Director may be reviewed by the Assistant Director (General Counsel), Bureau of Prisons. Policy Statement 7400.5C, Sec. 10. *See* 28 C.F.R. Sec. 541.17.

An inmate charged with misconduct is entitled to notice of all charges against him at least 24 hours before his hearing. Policy Statement, 7400.5C, Sec. 9(c)(1). *See* 28 C.F.R. Sec. 541.15(a). He also is entitled to select a correctional staff member as an advocate for his position; the IDC may order the hearing continued to assure that the selected advocate has sufficient time to prepare for the hearing. Policy Statement, 7400.5C, Sec. 9(c)(2). *See* 28 C.F.R. Sec. 541.15(b). An inmate is permitted to call witnesses and to present documentary evidence on his behalf; the staff representative may question these witnesses or, if the right to a staff representative is waived, the inmate may submit written questions to be asked by the IDC.[10] Policy Statement 7400.5C, Sec. 9(c)(3). *See* 28 C.F.R. Sec. 541.15(c). If the IDC refuses to call a witness requested by the inmate, the reasons for the refusal must be determined in the record. Policy Statement 7400.5C, Sec. 9(c)(3). *See* 28 C.F.R. Sec. 541.15(c). The inmate is entitled to be present during all phases of the hearing, except during the deliberations of the IDC. Policy Statement 7400.5C, Sec. 9(c)(5). *See* 28 C.F.R. Sec. 541.15(c).

The proceedings before the IDC are adversarial in nature and are sufficiently formal to assure that any constitutional error will either be corrected in the course of the proceeding, or avoided entirely. Inmates are represented by advocates, and are permitted to present evidence in their defense. The IDC is required to engage in principled

---

**9.** The plaintiffs have argued that in order to determine whether the third part of the *Butz* analysis is satisfied, a court should examine the procedure that was *actually* afforded them. In my view, the degree of procedural formality must be determined by examining the procedural safeguards which *should* have been afforded the plaintiffs; if, as the plaintiffs suggest, courts examined only the procedure actually afforded, then the decision to provide absolute immunity would depend entirely upon the degree which the IDC departed from traditional notions of procedural regularity. In other words, if procedural error was egregious, absolute immunity would not be available as a defense. Such an analysis would be akin to a qualified immunity analysis because the availa-

bility of absolute immunity would depend upon the degree to which the defendant's actions departed from accepted standards of conduct. *Cf. Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (defense of qualified immunity unavailable if actions clearly are at variance with established constitutional right).

**10.** This right to call witnesses is not unlimited; the IDC may refuse to call a witness if the testimony would be cumulative or if the presence of the witness would implicate security considerations. Policy Statement 7500.5C, Sec. 9(c)(3). In any event, inmates are not permitted to conduct any examinations of witnesses.

decision making, to make detailed findings of fact, and to explain the basis for its decision in writing. At least two of the members of the IDC must be senior officials holding a position equivalent to a department head position; thus, the IDC's decision is unlikely to be a result of intimidating influences. Finally, any decision is subject to several levels of appellate review; the efficiency of the review is demonstrated by the decision to modify, and, ultimately, to reverse the IDC's decision in this case. I believe that IDC proceedings are sufficiently formal to satisfy the third prong of the *Butz* test and to warrant the extension of absolute immunity to IDC members.

In sum, I believe that the IDC members act in a quasi-judicial fashion, that a substantial risk of retaliatory litigation exists, and that the procedural rules governing the conduct of disciplinary proceedings are sufficient to assure that constitutional error will not go uncorrected; consequently, I would hold that the appellants, all members of the IDC, are entitled to absolute immunity. *Butz v. Economou*, 438 U.S. at 511–512, 98 S.Ct. at 2913–2914.